SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Martin J. DRUFFNER, Justin F. Ficken, Skifter Ajro, John S. Peffer, Marc J. Bilotti and Robert E. Shannon, Defendants.

Civil Action No. 03–12154–NMG.

United States District Court,
D. Massachusetts.

Aug. 14, 2007.

R. Bradford Bailey, Gary G. Pelletier, Denner Pellegrino LLP, Laurie C. Carafone, Michael A. Collora, David M. Osborne, Dwyer & Collora, LLP, J.W. Codinha, David M. Ryan, Deborah L. Thaxter, Nixon Peabody, LLP, Kay B. Lee, Test, Hurwitz, & Thibeault, LLP, Jason C. Moreau, John A. Sten, Greenberg Traurig LLP, Robert L. Ullmann, Nutter, Sarah E. Walters Nutter, McClennen & Fish, LLP, Boston, MA, Steven N. Fuller, Akerman Senterfitt LLP, Lauderdale, FL, Daniel M. Rabinovitz, Michaels & Ward, LLP, Boston, MA, for Defendants.

Franklin C. Huntington, IV Securities and Commission, Beth Lehman, R. Daniel O'Connor, Securities and Exchange Commission, Daniel M. Rabinovitz, Michaels & Ward, LLP, Boston, MA, Jeffrey T. Infelise, U.S. Securities and Exchange Commission, Washington, DC, for Plaintiff.

### MEMORANDUM & ORDER

NATHANIEL M. GORTON, District Judge.

This is an SEC enforcement action for violation of 15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5. Currently pending before the Court is a motion of Plaintiff Securities and Exchange Commission ("the SEC") for summary judgment with respect to Defendant Justin F. Ficken ("Ficken"), one of the six individuals named in the Complaint. The

SEC is seeking disgorgement of ill-gotten gains with pre-judgment interest, a permanent injunction and a civil penalty.

## I. *Background*

### A. Factual Background

Ficken was a broker at the Boston branch of Prudential Securities, Inc. ("PSI") between 1999 and 2003. Sometime between 2000 and 2001, Ficken became affiliated with a brokerage team led by Martin Druffner ("the Druffner Group"). From January, 2001 to September, 2003, the Druffner Group, including Ficken, allegedly used fraud to help their clients engage in market timing. Market timing is a trading strategy in which traders rapidly buy and sell mutual fund shares to exploit brief discrepancies between the official stock prices used to determined the value of the mutual fund shares, and the prices at which those stocks are actually trading. The discrepancy occurs because the value of the fund is calculated only once each day. The practice is highly discouraged because frequent buying and selling of mutual fund shares increases the fund management costs for long term holders. Many mutual funds, including the ones mentioned in this case, prohibit market timing by imposing restrictions on excessive trading by individual accounts.

The SEC alleges that Ficken and his associates violated securities laws by engaging in market timing activities through false statements and intentional misrepresentations. Specifically, the SEC asserts that the defendants used multiple broker identification numbers (financial advisor numbers hereinafter "FA numbers") and opened numerous customer accounts to evade restrictions to prevent market timing. Each PSI broker was assigned an FA number and those numbers were used to open customer accounts, submit transactions and track commissions. When two or more PSI brokers worked as a team to service a common customer they often received a "joint" FA number to facilitate a specific commission split. In addition, a PSI broker could sometimes receive an "also" FA number to allow that broker's customers to gain computer access to their own account information or to receive commission discounts.

According to the SEC, Druffner Group allegedly used 13 different FA numbers, despite the fact that it only had five customers and the commission ratios of members of the Druffner Group were constant. The Druffner Group also opened over 170 customer accounts under fictitious names. Such practices concealed the identities of the brokers and their clients, thereby making it difficult for the funds to detect the market timing activities. As a result, the mutual funds processed transactions that would otherwise have been rejected. When mutual fund companies did detect defendant brokers' market timing activities and imposed blocks on such market timing, the defendant brokers would switch to using unblocked FA numbers and customer accounts to evade the restrictions. The defendant brokers allegedly continued the offending activities even after PSI announced a policy prohibiting the use of manipulative techniques designed to avoid detection of certain trading activities, such as executing transactions through alternate FA numbers. In total, Ficken and his associates allegedly engaged in market timing trades with over 50 mutual fund companies in an amount that exceeded $1 billion.

The SEC filed a complaint against Skifter Ajro, Marc J. Bilotti, Martin J. Druffner, Justin F. Ficken, John S. Peffer and Robert E. Shannon on November 4, 2003. At a motion hearing on June 14, 2004, Judge Lindsay found that the SEC had

failed to comply with the requirements of Fed.R.Civ.P. 9(b), which requires that fraud be pled with particularity, and granted defendants' motions to dismiss the complaint with leave to the SEC to re-file within 30 days. The case was transferred to this Session on June 24, 2004. The SEC filed an amended complaint on July 14, 2004, and this Court denied the defendants' renewed motions to dismiss the amended complaint. In late 2006, the SEC settled its disputes with defendants Ajro, Druffner, Peffer and Shannon. Defendants Bilotti and Ficken remain parties to the action but only Defendant Ficken is subject to plaintiff's pending motion for summary judgment.

## B. Regulatory Framework

Section 17(a) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77a *et seq.*, provides that it is unlawful for any person in the offer or sale of securities:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.

Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78a *et seq.*, provides that it is unlawful:

To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules

and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b–5 thereunder provides that it is unlawful:

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

The SEC has authority under the Exchange Act to bring an action in district court to enjoin individuals from engaging "in acts or practices constituting a violation of any provision" of the securities laws. 15 U.S.C. § 78u(d).

## II. *Motion for Summary Judgment*

### A. Legal Standard

Summary judgment is appropriate where the moving party has shown, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with

respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party". *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-movant's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

### B. Analysis

The SEC moves for summary judgment asserting that no reasonable jury could return a verdict for the defendant with respect to the alleged violations of Section 17(a), Section 10(b) and Rule 10b–5. The defendant opposes the motion, claiming there is a genuine issue of material fact. In support, the defendant cites his own deposition testimony before the National Association of Securities Dealers ("NASD"), which functions as an arm of the SEC.

■ To prove a violation of Section 10(b) and Rule 10b–5, the SEC must show that: (1) the defendant made a misrepresentation in connection with the purchase or sale of securities; (2) the misrepresentation was material, and (3) the defendant had the requisite scienter. *See SEC v. Fife,* 311 F.3d 1, 9–10 (1st Cir.2002). The requirements for establishing a violation of Section 17(a) are nearly the same, although it does not require the SEC to show scienter to obtain an injunction. *See*

*Aaron v. SEC,* 446 U.S. 680, 695–96, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

#### 1. Misrepresentation

■ The SEC alleges that the subject defendant made misrepresentations in connection with the purchase or sale of securities. It supports that allegation with a detailed record describing transactions between the Druffner Group, including Ficken, and various mutual funds. The SEC successfully demonstrates that the Druffner Group used a total of 13 different FA numbers and over 170 brokerage accounts to carry out its market timing transactions even though the Druffner Group had only five clients, and that many of those fictitious FA numbers and accounts were registered individually or jointly under Ficken's name. The record also indicates that the accounts that the mutual funds blocked were replaced by new accounts many of which were registered under Ficken's name. In view of such convincing evidence, the Court concludes the defendant clearly misrepresented the nature of his and the Druffner Group's transactions to the mutual funds.

#### 2. Materiality

■ The SEC also alleges that the defendant's misrepresentations were material. In support, the SEC provides a detailed record containing the email conversations between the mutual funds and PSI in which the mutual funds ask PSI to forbid the Druffner Group's market timing activities. Those emails clearly indicate that the mutual funds had prohibited rapid transactions within individual accounts in order to stop market timing. Using a multitude of FA numbers and accounts was a method of concealing the true identities of the defendant and the Druffner Group. Had it not been for such misrepresentations, the mutual

funds would not have allowed the transactions undertaken by the defendant. As a result, the Court concludes that the defendant's misrepresentations were material.

### 3. Scienter

The SEC also claims that the record supports the conclusion that the defendant acted with the requisite scienter. The Supreme Court defines scienter as "a mental state embracing intent to deceive, manipulate, or defraud". *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The First Circuit has held that scienter may be established by indirect evidence, and "may extend to a form of extreme recklessness". *In re Cabletron Systems, Inc.*, 311 F.3d 11, 38 (1st Cir.2002). In this context, however, "recklessness" must be beyond ordinary negligence, rising to "a lesser form of intent". *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198–99 (1st Cir.1999). The First Circuit cautions courts in summary judgment motions where, as here, "the movant bears the devoir of persuasion as to the nonmovant's state of mind". *In re Varrasso*, 37 F.3d 760, 764 (1st Cir.1994). It does acknowledges, however, "in certain cases, circumstantial evidence may be sufficiently potent to establish fraudulent intent beyond hope of contradiction". *Id.*

■ This is one of those cases. The record contains ample evidence indicating that the defendant's actions were intentionally geared toward evading detection by the mutual fund managers. The email communications between Ficken and his clients reflect Ficken's awareness of his misrepresentations. On February 4, 2002, Ficken sent an email to Chronos Asset Management, one of his market timing clients, stating: "As I look for space within the Zurich Accounts, I am a bit weary as to which funds have been previously trad-

ed and stopped". The next day, Chronos replied to Ficken with a list of all blocked Zurich accounts since January, 2000. On April 12, 2002, Ficken sent an email to Jemmco Advisers, another market timing client, stating:

> If I'm correct, your firm has investment models that dictate your trading. However, all I ask is that it avoid doing back to back trades on consecutive days. Often times, particularly with international funds, trading consecutive days creates log jams, causing the trades to be manually processed and scrutinized by people not to [sic] fond of our trading.

On November 29, 2002, Ficken sent an email to a market-timing customer with several recommendations, including the purchase of $40,000 of Pioneer mutual funds through two accounts. Ficken explained: "Pioneer doesn't monitor trades under $25,000 so I figure we can do $20,000 in both accounts".

The record also contains numerous emails authored by the mutual fund representatives attempting to stop Ficken and the Druffner Group's market timing activities. For example, on August 9, 2001, Hartford Mutual Funds sent Ficken an email informing him he could not open new accounts place trades, or receive trail commissions after September 10, 2001. The letter stated:

> We have sent you warnings that your trading behavior violates the policies and procedures established by The Hartford Mutual Funds, and we have terminated your exchange privileges on more than one occasion. Despite the warnings and terminations, you simply close one account and open another account. And, you continue to violate our prohibitions on market timing.

On December 19, 2002, Van Kampen, a mutual fund company, sent an email to PSI listing Druffner Group members, in-

cluding Ficken, who had engaged in market timing in its funds. The email stated that Van Kampen had communicated with the brokers "about stopping their timing activity to no avail". The email continued:

Over the past several months, we have placed stops on 325 of their accounts as of 11/30/02 and continue to add accounts daily. We see new accounts/rep ID combinations being opened and have determined that we are not able to continue chasing them within our funds. We feel our only course of action to protect our fund shareholders is to prohibit the attached list of reps from doing business with Van Kampen Funds.

On April 15, 2003, another mutual fund company sent an email to PSI listing twenty market timing accounts at the Boston branch that had been blocked. The email stated:

We are trying everything possible on our side to stop market timing, and make it as difficult as possible; but these reps do not seem to be getting it. I was wondering if there was something that you could do on your side to help us with the enforcement of our Market Timing policy? It just seems like we add another account to this list every day.

These emails are just examples of many similar email communications that transpired between PSI and the mutual funds. On the basis of such unequivocal evidence, the Court finds that the SEC has carried its burden to prove scienter.

The only issue raised by Ficken in opposition to summary judgment is his general denial he "use[d] multiple accounts and FA numbers to trick fund companies that had placed restrictions on his trading activities". In support, the defendant cites a portion of his own sworn testimony before the NASD during the SEC's initial investigation before the filing of the Complaint.

The defendant does not expressly identify the genuine issue of material fact raised by the excerpt in which he admits to his market timing activities, saying "I really focused on, you know, assisting [Martin Druffner] with his market timing activities". At one point, however, the defendant mentions that the numerous FA numbers were created solely to facilitate commission splits and for technology purposes but he does not address the reasons behind the Druffner Group's opening of over 170 accounts. In light of that unequivocal evidence and the defendant's failure to submit to subsequent interrogation, as discussed below, the defendant's denial does not rise to the level of a genuine issue.

■ The SEC suggests that an adverse inference should be drawn from the defendant's failure to submit to interrogation, by invoking his Fifth Amendment rights. The defendant vigorously opposes such an inference, arguing it is unconstitutional to sanction Ficken for invoking a constitutional right. Parties are free to invoke the Fifth Amendment in civil cases, and it is unconstitutional to draw a direct inference of guilt from silence. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977)(The Fifth Amendment is violated when "refusal to waive the Fifth Amendment privilege leads automatically and without more to imposition of sanctions"). The Court is, however, equally free to draw adverse inferences from the failure of proof of the party invoking the Fifth Amendment. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *accord SEC v. Colello*, 139 F.3d 674, 678 (9th Cir.1998) ("Colello's receipt of investor mo-

nies for an alleged purpose that was never disclosed to the investors, together with his assertion of his Fifth Amendment privilege in response to questions about his ownership claims [in the funds], demonstrate the absence of any legitimate call on the funds."). Otherwise, in a civil action, the invocation of the privilege necessarily results in a disadvantage to the opposing parties.

■ In the instant case, the record contains sufficient evidence to meet the burden of persuasion with regard to the summary judgment motion and the defendant's response fails to raise a genuine issue of material fact. That evidence, combined with the defendant's invocation of his Fifth Amendment privilege, leads the Court to the conclusion that the defendant violated the statutes in question and summary judgment is, therefore, appropriate.

## III. *Disgorgement*

### A. Unjust Enrichment

With respect to damages, the SEC seeks the disgorgement of Ficken's net commissions from his market timing activities in the amount of $732,281, plus pre-judgment interest. Ficken contends he should not be ordered to pay disgorgement, claiming that he has long ago suffered a deprivation of the gains alleged by the SEC. He also argues that the Court should consider that he is destitute. He asserts that ordering the payment of the requested damages would, in his case, have a punitive effect. Instead, he recommends damages, if any, at $15,000, which he maintains is in line with his ability to pay. He does not, however, take issue with or present evidence against the SEC's figure representing the net commissions from his market timing activities.

■ Disgorgement orders are necessary to deprive the wrongdoers of their ill-gotten gains:

The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972). The purpose of disgorgement is to prevent unjust enrichment and, as such, it is an equitable remedy and "does not serve to punish or fine the wrongdoer, but simply serves to prevent the unjust enrichment." *SEC v. Happ*, 295 F.Supp.2d 189, 198 (D.Mass.2003)(citing *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir.1993)).

■ What the defendant does with the illegally obtained profits is irrelevant for the purposes of disgorgement. The disgorgement does not include the income earned by a defendant on his illegally-obtained funds. *Manor Nursing*, 458 F.2d at 1104; *see also Janigan v. Taylor*, 344 F.2d 781, 787 (1st Cir.1965)("If an artist acquired paints by fraud and used them in producing a valuable portrait we would not suggest that the defrauded party would be entitled to the portrait."). Similarly, disgorgement is not reduced if the defendant loses money on the profits he incurred illegally by imprudent investment, lavish spending or any other way. *See, e.g., SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192 n. 6 (9th Cir.1998)(defendant's disgorgement obligations were not affected by the fact that the "scheme ultimately failed and [defendant] lost … $1,000,000 of his own funds"). To hold otherwise would give incentive to parties to engage in securities violations with no threat of monetary repercussions so long as the ille-

gally obtained profits are squandered prior to a lawsuit.

■ In addition to arguing that he has not retained the funds from his market-timing activities, the defendant contends that disgorgement is an equitable remedy, and as such, the Court should limit its amount based upon defendant's ability to pay. The courts that have considered the issue have held that financial hardship is not grounds for denying disgorgement. *See, e.g., SEC v. McCaskey,* 2002 WL 850001, at *5 (S.D.N.Y. Mar.26, 2002). The Court agrees with the SEC that the defendant's financial status is not a relevant consideration in the determination of the disgorgement amount.

■ The SEC seeks an amount equal to the defendant's net commissions from his market timing activities. The defendant does not dispute the amount of damages. The disgorged amount must be "causally connected to the violation", but it need not be figured with exactitude. *Happ,* 392 F.3d at 31. Where disgorgement calculations cannot be exact, any "risk of uncertainty ... should fall on the wrongdoer whose illegal conduct created that uncertainty". *Id.* Based on the PSI documents, the SEC requests disgorgement in the amount of $732,281. Beyond his general assertions of financial hardship, the defendant does not dispute the propriety of that sum. In light of the volume of market timing in which the Druffner Group engaged, the Court concludes that SEC has satisfied its burden of establishing that $732,281 is a reasonable approximation of the amount of unjust enrichment.

**B. Prejudgment Interest**

■ The SEC also urges the Court to award prejudgment interest. That decision is analyzed separately from disgorgement:

Disgorgement and prejudgment interest, while both aimed at depriving a defendant of ill-gotten gains, are nonetheless distinct remedies and cases repeatedly analyze them separately, frequently referring to the broad discretion of district courts to decide whether to award prejudgment interest.

*SEC v. Sargent,* 329 F.3d 34, 41 n. 1 (1st Cir.2003). The First Circuit endorses, however, the award of prejudgment interest in securities violations:

Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations. An award of prejudgment interest is based on consideration of a variety of factors, including the remedial purpose of the statute involved, the goal of depriving culpable defendants of their unlawful gains, and unfairness to defendants.

*Id.* at 40 (quotation marks, citations, and brackets omitted). In the case at hand, unlike the defendant in *Sargent,* Ficken derived direct monetary benefit from his misrepresentations and retained those profits unjustly. The Court concludes, therefore, that prejudgment interest is necessary to prevent Ficken from receiving the benefit of what would otherwise be an interest-free loan.

The SEC submits that the appropriate rate of prejudgment interest is the rate used by the Internal Revenue Service to calculate underpayment penalties. *See* 26 U.S.C. § 6621(a)(2) (defining the IRS underpayment rate as the Federal Reserve short term interest rate plus three percentage points). The Court agrees that this rate is appropriate under the circumstances. *See SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996)("[C]ourts have approved the use of the IRS underpayment rate in connection with disgorgement"). As such, the Court

agrees with SEC's interest accounting of $140,366, computed from the time the Complaint was filed to the present.

### C. Civil Penalties

The plaintiff also moves the Court to award civil penalties. Section 20(d)(1) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize a court to impose a civil penalty for certain violations of the federal securities laws. 15 U.S.C. § 77th (d)(2); 15 U.S.C. § 78u (d)(3). Some courts have considered a defendant's ability to pay when determining the amount of civil penalties to impose or whether to waive civil penalties. *See, e.g., SEC v. Soroosh,* 1998 WL 904696, at *2 (9th Cir. Dec.24, 1998) (imposing a reduced fine because of the defendant's lack of resources); *SEC v. Rubin,* 1993 WL 405428, at *6–7 (S.D.N.Y. Oct.8, 1993) (ordering disgorgement of profits and commissions earned on improper trades but taking into account defendants' financial situations when calculating civil penalties). In its memorandum, the SEC also concedes that when setting the amount of the civil penalty, the Court may properly consider Ficken's financial circumstances.

The Court concludes that the imposition of civil penalties in this case is unwarranted. According to the attachment to Ficken's affidavit, his total assets are worth less than $30,000 and he does not have the means to pay any civil penalties. His 2005 tax return indicates an annual salary of about $30,000. As such, the current damages award will suffice.

### D. Permanent Injunction

The SEC also seeks an injunction against further violations of the federal securities laws. 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future. *SEC v. Bilzerian,* 29 F.3d 689, 695 (D.C.Cir.1994). In order to determine whether a reasonable likelihood of future violations exists, the Court considers:

whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future.

*Id.* In this case, Ficken's violations were flagrant, deliberate and part of a pattern. The defendant and the Druffner Group, motivated by the prospect of financial gain, engaged in fraudulent activities over an extended period of time. The Court has already entered permanent injunctions against Ficken's associates in the Druffner Group, and finds that an injunction is proper in this case as well.

### ORDER

For the foregoing reasons, the motion for summary judgment of the plaintiff SEC (Docket No. 110) is **ALLOWED.** The defendant is ordered to pay $732,281 in disgorgement plus prejudgment interest of $140,366. The defendant is also enjoined from any further violations of federal securities laws.

**So ordered.**