# United States Court of Appeals
## For the First Circuit

No. 07-2532

SECURITIES & EXCHANGE COMMISSION,

Plaintiff-Appellee,

v.

JUSTIN F. FICKEN,

Defendant-Appellant,

and

MARTIN J. DRUFFNER, SKIFTER AJRO, JOHN S. PEFFER,
MARC J. BILOTTI, AND ROBERT E. SHANNON,

Defendants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before
Boudin and Dyk,[*] Circuit Judges,
and Domínguez,[**] District Judge.

Dominick v. Freda, with whom Jacob H. Stillman and John
W. Avery were on brief, for plaintiff-appellee.
Gary G. Pelletier, for defendant-appellant.

October 20, 2008

[*]Of the Federal Circuit, sitting by designation.

[**]Of the District of Puerto Rico, sitting by designation.

**DYK**, **Circuit Judge**. The Securities and Exchange Commission ("SEC") filed a civil complaint against defendant-appellant Justin F. Ficken ("Ficken") and others in the United States District Court for the District of Massachusetts, alleging violations of 15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5. The SEC alleged that Ficken intentionally concealed his identity and the identities of his clients while trading shares of mutual funds, in order to mislead mutual fund companies into processing trades that they otherwise would not have allowed. The district court granted the SEC's motion for summary judgment against Ficken, finding no genuine issue of material fact as to any relevant issue, including scienter. SEC v. Druffner, 517 F. Supp. 2d 502 (D. Mass. 2007). We affirm.

## I.

The federal securities laws ban fraud and other deceptive practices in connection with the purchase and sale of securities. See Securities Act of 1933 § 17(a), 15 U.S.C. § 77q(a) (prohibiting fraud and material misrepresentations or omissions in the offer or sale of securities); Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) (prohibiting manipulative or deceptive practices in violation of SEC regulations in the purchase or sale of securities); SEC Rule 10b-5, 17 C.F.R. 240.10b-5 (prohibiting fraud and material misrepresentations or omissions in the purchase or sale of securities). A misrepresentation is material if there is

a substantial likelihood that the misrepresentation would affect the behavior of a reasonable investor. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  Proof of scienter is required to establish violations of § 17(a)(1), § 10(b), or Rule 10b-5, while negligence is sufficient to establish liability under § 17(a)(2) or § 17(a)(3).  See Aaron v. SEC, 446 U.S. 680, 694-97 (1980); SEC v. Fife, 311 F.3d 1, 9-10 (1st Cir. 2002).

Scienter is an intention "to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n.12 (1976).  In this circuit, proving scienter requires "a showing of either conscious intent to defraud or 'a high degree of recklessness.'" ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008) (quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)). "Recklessness is 'a highly unreasonable omission, involving not merely simple, or even inexcusable[] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'"  SEC v. Fife, 311 F.3d at 9-10 (quoting Greebel v. FTP Software, 194 F.3d 185, 198 (1st Cir. 1999)).

The question here is whether defendant Ficken's conduct as a broker violated the securities laws.  Ficken worked as a broker in a Boston branch office of Prudential Securities, Inc.

("PSI"), from October 1999 to September 2003. He purchased and sold mutual fund shares on behalf of customers. In doing so he engaged in market timing. "Market timing" is a mutual fund share trading strategy that "exploit[s] brief discrepancies between the stock prices used to calculate the shares' value once a day, and the prices at which those stocks are actually trading in the interim." Kircher v. Putnam Funds Trust, 547 U.S. 633, 637 n.4 (2006). The price of mutual fund shares is calculated at the close of U.S. trading, but in the case of a foreign stock exchange listed company, the share price calculation uses the latest foreign market closing prices. Because of time zone differences between the daily closings of the foreign and U.S. markets on which a mutual fund's portfolio of securities trades, someone engaging in market timing can buy or sell mutual fund shares based on the foreign markets' closing prices but utilizing information that becomes known after the foreign markets closed (information that will not be reflected in the foreign market closing prices until the next day).

Although market timing is not illegal, mutual fund companies often prohibit market timing in order to protect long-term shareholders from dilution and other adverse effects caused by rapid and repeated short-term market timing transactions.[1] When a

---

[1] See Staff Report to the United States Securities and Exchange Commission, Exemptive Rule Amendments of 2004: The Independent Chair Condition (April 2005), at 32, available at http://www.sec.gov/news/studies/indchair.pdf.

mutual fund company that prohibits market timing detects market timing, the mutual fund company often blocks future trades utilizing that broker's so-called financial advisor ("FA") number and/or the customer account number used in the market timing trade.

Ficken and other brokers at PSI were assigned FA numbers. These FA numbers allowed brokers to open customer accounts, execute trades, and track commissions. Each customer account had an individual number assigned to it, and each customer account number had an individual FA number assigned to it. Brokers used a customer's account number to submit mutual fund transactions on behalf of the customer. Ficken had at least seven FA numbers registered under his name alone or jointly with one or more of the brokers in his group at PSI, and his group eventually opened over 170 customer accounts for only five customers. Ficken and the brokers in his group at PSI used these FA numbers and customer account numbers in trading with over 50 mutual fund companies in amounts exceeding $1 billion.

While Ficken worked at PSI, several mutual fund companies suspected PSI brokers of market timing and consequently blocked trading under some of Ficken's FA numbers, customer account numbers, or both. It is undisputed that after mutual fund companies blocked Ficken's FA numbers or customer account numbers, Ficken then used new FA or customer account numbers, or both, to trade the companies' mutual funds.

The SEC's theory was that Ficken violated federal securities laws by utilizing new FA numbers and customer account numbers to evade mutual fund companies' restrictions on trading using existing FA and customer account numbers. Ficken's defense was that his use of new customer account numbers and FA numbers was not intended to mislead mutual fund companies or inaccurately identify customers and brokers, but was instead done for legitimate reasons.

Ficken resigned from PSI in 2003 following allegations that his group of brokers at PSI was involved in improper market timing activities. On October 1, 2003, he testified in a proceeding conducted by the SEC as part of its investigation of PSI. Ficken did not assert his Fifth Amendment privilege against self-incrimination in the proceeding. On December 17, 2003, Ficken testified in an investigation proceeding conducted by the National Association of Securities Dealers ("NASD"). The NASD (now succeeded by the Financial Industry Regulatory Authority) was a private self-regulatory organization with regulation and enforcement authority over securities firms under 15 U.S.C. § 78o--3. In the NASD proceeding, Ficken also testified but invoked his Fifth Amendment privilege against self-incrimination as to certain questions. In both the SEC and NASD proceedings Ficken sought to justify his practices as being legitimate, at least under some circumstances. For example, he testified that he used new FA

numbers with the permission of the mutual fund companies and that he used new FA numbers to facilitate the splitting of commissions with other brokers or to accommodate clients' "technology" needs.

The SEC filed a civil complaint against Ficken and his co-defendants in November 2003. The SEC alleged in its amended complaint that Ficken attempted to evade market timing detection by using multiple FA numbers and multiple customer account numbers in order to "conceal [his] own identit[y] and the identities of [his] clients" and thus to "mislead[] the fund companies to process transactions they would otherwise have rejected." Pl. Am. Compl. ¶ 3. The SEC also alleged that Ficken "made false statements to the mutual fund companies by using fictitious names on the customer accounts" and "made omissions of material fact by failing to disclose to the fund companies that the numerous accounts" and FA numbers Ficken used in trading mutual fund shares belonged to the same brokers and customers whose trading activities "had previously been blocked" by the mutual fund companies. Id. at ¶ 18. When the SEC sought to depose Ficken as part of the present proceeding, Ficken asserted his Fifth Amendment rights and refused to be deposed.

The SEC moved for summary judgment. The SEC's motion for summary judgment pointed out that Ficken was well aware of the

funds' policies.[2]   The SEC also relied on Ficken's e-mail communications with customers, which discussed his market timing and his blocked FA numbers and customer account numbers, to demonstrate Ficken's intent to mislead mutual fund companies into processing trades that he knew would violate the mutual fund companies' market timing and excessive trading restrictions.   For instance, on October 30, 2001, Ficken sent an e-mail to one of his clients stating, "when using Seligman, it is crucial to implement some sort of fund rotation. They look carefully at accounts hitting the same funds over and over again."   On February 4, 2002, Ficken sent an e-mail to the same client stating, "As I look for space within the Zurich Accounts, I am a bit weary as to which funds have been previously traded and stopped."   On February 5, 2002, the client responded by sending Ficken a list of its accounts that had

---

[2]     For instance, on August 9, 2001, Hartford Mutual Funds sent Ficken a letter stating,

> We have sent you warnings that your trading behavior violates the policies and procedures established by The Hartford Mutual Funds, and we have terminated your exchange privileges on more than one occasion. Despite the warnings and terminations, you simply close one account and open another account. And, you continue to violate our prohibitions on market timing.
> Therefore, The Hartford Mutual Funds will, as of September 10th, 2001, no longer open new accounts with you as broker of record and will not allow you to effect any trades on any accounts, new or old, as of that date.

been blocked since January 2000. Similarly, on April 12, 2002, Ficken sent an e-mail to another client recommending a trading strategy and stating,

> [A]ll that I can ask is that it avoid doing back to back trades on consecutive days. Often times . . . trading consecutive days creates log jam, causing the trades to be manually processed and scrutinised [sic] by people not to [sic] fond of our trading. . . . I suggest you do not hit the same fund within each account. Meaning, try not to trade the same <u>BlackRock</u> fund within all your accounts on the same day.

(alternation in original). On April 2, 2003, Ficken sent an e-mail to another client stating,

> [Y]ou need to be somewhat flexible with regards to how we gain access to the various Fund Families. Some are far more vigilant than others - buying the shortest duration Bond Fund in a large quantity is a dead give-away as far as market <u>timing</u>. I always try to place the money in respective Fund Families with the intent on avoiding losses in Bond positions. However, sometimes it happens.

(alternation in original). On May 7, 2003, Ficken sent an e-mail to another client explaining that Ficken was going to sell shares in a certain account because "American [Funds] finally clipped my last rep id [FA number]."

In his opposition to the SEC's motion for summary judgment, Ficken did not dispute that the SEC had produced substantial evidence supporting a finding of scienter. Instead, Ficken argued that testimony he presented in the prior NASD proceedings raised a genuine issue of material fact regarding his

scienter. In the NASD proceeding, Ficken testified that he used multiple FA numbers in order to split commissions with different brokers and to accommodate his clients' technology needs, such as their need to gain access to their accounts or to receive commission discounts.[3] Ficken also claimed that mutual fund companies that previously had blocked one or more of his FA numbers later encouraged him to acquire a new FA number to conduct legitimate trades, and that he relied on this encouragement in good faith when obtaining a new FA number. This encouragement was conditioned in part on Ficken's promise to abide by the mutual fund companies' market timing policies. Ficken's opposition also argued that the SEC did not need to depose Ficken in this proceeding, because it could "utilize the answers that Ficken provided in his [prior NASD and SEC] depositions" and that "[t]hese

---

[3]  Q. Okay. Other than compensation break-outs as the reason for all these FA numbers would you have any other reason to use these - to have as many FA numbers?
A. Well, again the ALSO number [a type of FA number] was - was required for the technology purposes. You know, I - it's not a number that I ever thought I'd need other than the fact the CIBC [a bank providing leverage to some of Ficken's clients] told me they needed some sort of technology.
Q. Okay. Other than the ALSO number would you have any other reason other than compensation to have so many rep ID numbers [FA numbers]?
A. I don't think so.

Ficken NASD testimony, p. 46, l. 19 - p. 47, l. 6.

-10-

depositions provide ample basis for cross-examination at trial." Mem. Opp'n Pl.'s Summ. J. Mot. 6.

The district court granted summary judgment for the SEC, first concluding that the e-mails and other evidence presented by the SEC showed that Ficken made material misrepresentations with scienter by using multiple FA numbers and multiple customer account numbers to deceive mutual fund companies into allowing trades they otherwise would have rejected. SEC v. Druffner, 517 F. Supp. 2d at 508-09. The district court then concluded that Ficken's opposition did not raise a genuine issue as to scienter (1) because the NASD testimony relied on in the opposition did not address his use of multiple customer account numbers, and (2) because Ficken's "failure to submit to subsequent interrogation" (by claiming his Fifth Amendment privilege) justified an adverse inference on the issue of scienter. Id. at 510-11.

The district court ordered Ficken to disgorge the commissions he obtained from his fraudulent mutual fund trades, plus pre-judgment interest, in order to prevent unjust enrichment. Id. at 511-12. The district court later fixed these amounts at $494,975 of commissions and $94,879 of pre-judgment interest. The district court also enjoined Ficken from further violations of the securities laws because his "violations were flagrant, deliberate and part of a pattern," but declined to award civil penalties because Ficken did not have the means to pay them. Id. at 513.

-11-

Ficken timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review the district court's grant of summary judgment de novo. Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d 37, 39 n. 1 (1st Cir. 2002). Summary judgment is, of course, appropriate only where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A genuine issue of material fact was recently defined in Enica v. Principi, __ F.3d __, 2008 WL 4457541, at *5 (1st Cir. 2008). "In the summary judgment context, 'genuine' has been construed to mean 'that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" Id. (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)). "Similarly, a fact is 'material' if it is 'one that might affect the outcome of the suit under the governing law.'" Enica at *5 (quoting Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 748 (1st Cir. 1994).

Although it is unusual to grant summary judgment on scienter, summary judgment on this issue is sometimes appropriate. "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J.

-12-

Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). See also Vives v. Fajardo, 472 F.3d 19, 21 (1st Cir. 2007) (citing Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)); Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996).

Ficken does not dispute that the SEC produced substantial evidence of Ficken's scienter. As noted earlier, the SEC presented e-mail communications between Ficken and his clients indicating that Ficken fraudulently used duplicative FA numbers and duplicative customer account numbers to misrepresent his identity and that of his clients in order to deceive mutual fund companies into allowing trades that they otherwise would have blocked. This meets the scienter requirement of § 17(a)(1), § 10(b), and Rule 10b-5, and more than meets the negligence requirement of § 17(a)(2) and § 17(a)(3).

Ficken argues that testimony he presented in the prior SEC and NASD proceedings raised a genuine issue of material fact regarding his scienter. In neither the prior SEC proceeding nor the NASD proceeding did Ficken provide any legitimate explanation for the use of duplicative client account numbers. Thus Ficken has raised no genuine issue of material fact regarding his use of multiple client account numbers, and the SEC's evidence of Ficken's scienter in this respect is undisputed.[4] However, the parties

---

[4] Ficken claims that his SEC testimony raised the issue whether he knew his practices were contrary to PSI's own policies on market timing, since PSI did not prohibit market timing in non-

-13-

disagree whether the district court's judgment can be sustained based only on the undisputed proof of Ficken's scienter with respect to his use of the customer account numbers. Ficken argues, for example, that if his use of the FA numbers were determined to be legitimate, this would affect the amount of disgorgement. Even assuming that the measure of disgorgement would be affected, thus making it necessary to address the FA numbers, Ficken has still failed to raise a genuine issue as to whether his use of duplicate FA numbers was legitimate.

To be sure, Ficken's testimony in the SEC proceeding might raise a genuine issue as to scienter with respect to the FA numbers. But Ficken cannot now rely on that testimony. Under both federal Rule 56(e) and local Rule 56.1, a party opposing summary judgment must refer to specific parts of the record to raise a genuine issue of material fact. In opposing the SEC's motion for summary judgment in the present proceeding, Ficken did not refer to specific testimony from the SEC proceeding in order to raise a genuine issue of material fact. He instead relied on his SEC testimony only to explain why he did not need to submit to a deposition by the SEC in the present case.[5] Thus, Ficken's

proprietary mutual funds until January 2003. However, as the SEC points out, the mutual funds themselves had policies against market timing, and PSI prohibited market timing in proprietary mutual funds before January 2003.

[5] Because Ficken did not rely on his testimony in the SEC proceeding in opposing the SEC's summary judgment motion, we have

-14-

testimony in the SEC proceeding does not raise a genuine issue of material fact.

Ficken also cannot rely on his NASD testimony to raise a genuine issue as to the FA numbers. In the NASD proceeding, Ficken invoked the Fifth Amendment or otherwise refused to answer questions about blocked account numbers, a topic pertinent to scienter. Ficken's refusal to answer pertinent questions in the NASD proceeding bars his reliance on that testimony in opposing summary judgment.

Federal Rule of Civil Procedure 56(e)(1) states that in opposing summary judgment, an "affidavit must . . . set out facts that would be admissible in evidence." "Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." <u>Garside</u> v. <u>Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990) (finding that "absent a showing of admissibility" an

---

no occasion to determine whether Ficken's invocation of the Fifth Amendment privilege in this proceeding barred his reliance on his SEC testimony. This approach appears to turn on whether the SEC proceeding was a "separate proceeding." <u>See</u> <u>United States</u> v. <u>Johnson</u>, 488 F.2d 1206, 1210 (1st Cir. 1973) (holding that a former co-defendant's guilty plea in a Rule 11 hearing did not waive his Fifth Amendment privilege as a witness in defendant's later separate trial); <u>see also</u> <u>United States</u> v. <u>Parcels of Land</u>, 903 F.2d 36, 43 (1st Cir. 1990) (noting that if the defendant had testified in one proceeding and then invoked his Fifth Amendment privilege during a deposition in a separate proceeding, "neither would have affected the treatment of the other").

appellant could not rely on a third party's description of an expert's possible testimony to oppose summary judgment).[6]

Ficken's NASD testimony is hearsay and thus would not be admissible unless it met one of the hearsay exceptions. See Fed. R. Evid. 801, 802. Federal Rule of Evidence 804(b)(1) provides that the testimony of an unavailable witness is admissible. Ficken's apparent assumption is that his invocation of his Fifth Amendment privilege in this case made him unavailable for purposes of Rule 804. This assumption is dubious at best. Although this circuit has held that a witness invoking his Fifth Amendment privilege is unavailable under Rule 804, United States v. Zurosky, 614 F.2d 779, 792 (1st Cir. 1979), this likely does not extend to defendants who create their own unavailability. Other circuits have specifically held that a defendant does not become unavailable simply because he asserts his Fifth Amendment privilege.[7]

---

[6] See generally 30 Wright & Graham, Federal Practice and Procedure: Evidence § 6334 (1997) ("if [prior] testimony contains inadmissible hearsay, that hearsay cannot be relied upon in deciding the motion").

[7] See United States v. Bollin, 264 F.3d 391, 413 (4th Cir. 2001), cert. denied, 534 U.S. 935 (2001), and cert. denied, 535 U.S. 989 (2002); United States v. Peterson, 100 F.3d 7, 13-14 (2d Cir. 1996) (noting that "when a defendant invokes his Fifth Amendment privilege, he has made himself unavailable to any other party, but he is not unavailable to himself" and thus that it was within the district court's discretion to exclude the defendant's prior grand jury testimony when the defendant asserted the privilege at trial); United States v. Kimball, 15 F.3d 54, 55-56 (5th Cir. 1994), cert. denied, 513 U.S. 999 (1994), (holding that a defendant cannot create his own unavailability by asserting his Fifth Amendment privilege and then use this unavailability to

-16-

Even if Ficken were considered unavailable, the former testimony of an unavailable witness is not admissible unless "the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). For example, refusal to answer pertinent questions on cross-examination bars the use of direct testimony. See United States v. Bartelho, 129 F.3d 663, 673 (1st Cir. 1997), cert. denied 525 U.S. 905 (1998) ("A trial judge may strike a witness's direct testimony if he flatly refuses to answer cross-examination questions related to the details of his direct testimony." (internal quotations omitted)). Here the NASD proceeding did not involve direct examination by Ficken's lawyer followed by cross-examination. Rather, all of Ficken's testimony was given in response to NASD questioning. But this difference is irrelevant. The fact is that the government (and its predecessor the NASD) did not have the opportunity to develop Ficken's initial testimony because he asserted his Fifth Amendment privilege or otherwise refused to answer questions regarding blocked customer account numbers, an issue closely related to Ficken's use of FA numbers.[8]

---

introduce his own former testimony).

[8] The following exchange occurred:

Q. I'm going to ask him again to address the question,

-17-

The Fifth Amendment does not authorize a witness to rely on his testimony while shielding himself from further examination by utilizing his Fifth Amendment privilege. As the Supreme Court held in <u>Brown</u> v. <u>United States</u>, "a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all," and "[h]e cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute." 356 U.S. 148, 155-56 (1958). <u>See also</u> <u>United States</u> v. <u>Alosa</u>, 14 F.3d 693, 695-96 (1st Cir. 1994) (criminal defendant not entitled to testify on one charge but not another). Ficken's testimony would not be admissible because his assertion of his Fifth Amendment privilege or his refusal to answer questions prevented development of his testimony on closely related issues. For these

---

> please.
> A. [Ficken:] I – I can't answer that question.
> . . .
> Q. Will you allow him to answer any questions regarding blocks at this time?
> A. [Ficken's counsel:] No.
> . . .
> A. [Ficken's counsel:] Thank you. And my "no" to that question was based on the phraseology of "at this time."
>
> Ficken NASD testimony, p. 156, l. 1-4; p. 186, l. 8-10, 19-21. The parties appear to assume that the refusal to answer was based on the Fifth Amendment. Whether or not it was based on the Fifth Amendment, Ficken still refused to answer.

reasons Ficken cannot rely on his NASD testimony to raise a genuine issue for summary judgment.

Ficken thus has failed to raise a genuine issue of material fact with respect to either customer account numbers or FA numbers, and the district court properly granted summary judgment in favor of the SEC.

## III.

For the foregoing reasons, the judgment of the district court is <u>affirmed</u>.

-19-