# United States Court of Appeals
## For the First Circuit

No. 99-2114

AL RIZEK,

Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE SECURITIES AND EXCHANGE COMMISSION

Before

Lynch and Lipez, <u>Circuit Judges</u>,
and Keeton, <u>District Judge</u>.[*]

<u>José R. Riguera</u>, with whom <u>John R. Squitero</u> and <u>Katz, Barron, Squitero & Faust, P.A.</u> were on brief, for petitioner.
<u>Catherine A. Broderick</u>, Counsel to the Assistant General Counsel, with whom <u>Mark Pennington</u>, Assistant General Counsel, and <u>Meyer Eisenberg</u>, Deputy General Counsel, were on brief, for respondent.

June 16, 2000

[*]Of the District of Massachusetts, sitting by designation.

**LYNCH, Circuit Judge**.  Al Rizek was a vice president of PaineWebber Incorporated of Puerto Rico.  Over a ten-month period in 1993 he churned the accounts of five customers, causing losses of approximately $195,000 on accounts with average balances that totaled about $700,000.  This violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Although his customers indicated that they had conservative investment objectives, Rizek pursued the extremely risky strategy of trading U.S. Treasury bonds in an attempt to take advantage of short-term fluctuations in the market.  He magnified the risk by trading the accounts on margin.

In 1999, the Securities and Exchange Commission ordered that Rizek be permanently barred from the securities industry, cease and desist from violations, pay a civil penalty of $100,000, and disgorge over $120,000.  In doing so, the SEC departed from the recommendations of its own Administrative Law Judge, who would have imposed a disgorgement of over $275,000, but only a two-year suspension.  See generally In re Al Rizek, Exchange Act Release No. 41,725, 70 S.E.C. Docket 705 (Aug. 11, 1999), available in 1999 WL 600427.

Rizek, by petition for review of the SEC order, challenges the permanent bar order and the civil penalty; he does not challenge the findings that he excessively traded the accounts.  The essence of his argument is that the SEC was wrong in finding he had the degree of scienter required for such a

-2-

sanction: while his investment strategy may have been wrong, he had a good faith belief in it, he meant no harm, and he is remorseful.  From this he argues that a permanent bar from the industry where he has supported himself and his family for fifteen years is arbitrary and capricious, and so should be reversed.  He also urges that this court adopt a rule that when the Commission imposes a permanent bar, the most drastic sanction available, it must show that a less drastic remedy would not suffice to protect the public.

We decline that invitation and affirm the Commission order.

## I.

There is very little dispute about the underlying facts, which we take from the record before the Commission. The parties disagree, however, as to the conclusions that may be drawn from those facts.

The five customers in question -- Eddie Figueroa, Jorge Donato, José Acevedo, Hector Torres Nadal, and Herminio R. Cintron -- opened their accounts with Rizek in 1990 and 1991. Only Donato and Cintron had some prior experience investing in securities.  Acevedo and Torres had purchased CDs or similar investment products, while Figueroa had previously kept his money in a savings account.

Four of the customers' new account forms listed "speculation" last among possible investment objectives, while Rizek's record of Torres's account does not mention speculation

at all. Donato told Rizek that he was primarily interested in long-term bonds and the "safety of [his] investment." Acevedo testified that he was looking for a long-term investment; he was not willing to speculate or risk any of his principal. Cintron was planning for his retirement and his children's education; he testified that he was looking for "something that was safe"; Torres was also saving for retirement and described himself as "very cautious" and interested in "something that was protected and secure." Figueroa testified that he was willing to take "any type of risk," but that Rizek had counseled him that "given the small amount of money that [he] had, the most convenient thing was to put most of the savings into some safe investments and devote a small amount to moderate type of risk."

Torres and Cintron testified that Rizek never asked them later if they wanted to change their investment objectives to indicate a willingness to speculate. Acevedo, Donato, and Figueroa testified that they could not recall if Rizek had ever asked them about changing their objectives.

In early 1993, Rizek recommended a strategy of short-term trading of zero-coupon bonds to certain of his customers, including the five whose accounts are at issue here. Zero-coupon bonds are U.S. government instruments that accumulate interest until maturity, rather than paying interest periodically. The value of a zero-coupon bond is very sensitive to changes in interest rates. Rizek recommended that his customers purchase the bonds on margin, which significantly

increased the face value amounts of the trades, thus magnifying the potential gains and losses.  Purchasing on margin meant that the customers had to make monthly margin interest payments to PaineWebber; it also placed them at risk of being forced to sell at a loss to meet a margin call.

The SEC Division of Enforcement's expert witness testified that there was no economic logic to Rizek's trading strategy of swapping zero-coupon bonds, because bond prices move in parallel with each other.  The expert stated that only a "very sophisticated, experienced investor" could have understood Rizek's strategy and its risks.  On the other hand, Rizek's expert witness testified that trading zero-coupon bonds was an "accepted trading strategy," but conceded that Rizek's customers would have had to be able to tolerate "aggressive risk" for the strategy to have been appropriate for them.

Figueroa, Torres, and Cintron testified that they always followed Rizek's investment recommendations, while Donato said that he followed them "ninety-nine percent" of the time. Acevedo testified that he could not remember refusing any of Rizek's recommendations during the relevant period.

During the fifteen-month period from January 1993 to March 1994, the five accounts had average monthly balances of approximately $50,000; $85,000; $86,000; $165,000; and $312,000. During this time, Rizek carried out approximately $24 million in transactions on the accounts, generating tens of thousands of dollars in commissions and margin interest fees.  For example,

Rizek effected $1.6 million in transactions on the account with the $50,000 average balance, incurring average annual commissions of about $16,000 and interest fees of over $5,000. On the largest account, Rizek carried out $9.3 million in transactions, which generated average annual commissions of more than $82,000 and interest fees of over $30,000. All told, Rizek's strategy led to losses of approximately $195,000 on the five accounts, which had average monthly balances totaling about $700,000.

## II.

A sanctions order of the Commission must be upheld unless the order is a "gross abuse of discretion." A.J. White & Co. v. SEC, 556 F.2d 619, 624 (1st Cir.) (internal quotation marks omitted), cert. denied, 434 U.S. 969 (1977); see also Lawrence v. SEC, 398 F.2d 276, 280 (1st Cir. 1968).

Congress has charged the Commission with protecting the investing public. See, e.g., 15 U.S.C. § 78j(b) (referring to "rules and regulations . . . the Commission may prescribe . . . for the protection of investors"); see also Pierce v. SEC, 239 F.2d 160, 163 (9th Cir. 1956) ("The Commission is given the duty to protect the public. What will protect the public must involve, of necessity, an exercise of discretionary determination."). And so the question of the appropriate remedy is "peculiarly a matter for administrative competence." Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185 (1973) (quoting American Power & Light Co. v. SEC, 329 U.S. 90, 112 (1946))

(internal quotation marks omitted); see also Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194 (1941) ("[T]he relation of remedy to policy is peculiarly a matter for administrative competence . . . ."). As a result, the Commission's sanctions must be affirmed unless "unwarranted in law or . . . without justification in fact." American Power & Light, 329 U.S. at 112-13.

Rizek contends that his conduct was at most negligent and naive. He says that the violations involved only five of his 400 customers; that his strategy relied on predictions from Paine Webber's chief economist; and that he stopped investing in zero-coupon bonds when his customers began to lose money. He also points to the fact that he has given assurances against future violations. Rizek claims that the bar is improperly punitive in nature and not meant to protect the investing public.

Rizek argues that this court should follow Steadman v. SEC, 603 F.2d 1126 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981). Rizek claims Steadman held that a court should not affirm a permanent bar, the most drastic sanction available, unless the SEC has shown that no lesser remedy will suffice to protect the public interest. See id. at 1140.

We think Rizek's argument confuses two concepts. We understand Steadman to articulate no more than the well-established rule that agencies must sufficiently articulate the grounds of their decisions so that appellate courts are able to perform their function of judicial review meaningfully. The

Supreme Court made this point about the need for adequate SEC findings in <u>SEC</u> v. <u>Chenery Corp.</u>, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."); <u>see also</u> <u>Beck</u> v. <u>SEC</u>, 413 F.2d 832, 834 (6th Cir. 1969). This court has made the point in various contexts involving judicial review of administrative actions, and at times has remanded to the agency when it has not provided such an explanation. <u>See, e.g.</u>, <u>City of Boston</u> v. <u>U.S. Dep't of Hous. and Urban Dev.</u>, 898 F.2d 828, 835 (1st Cir. 1990); <u>Jasinskas</u> v. <u>Bethlehem Steel Corp.</u>, 735 F.2d 1, 5 (1st Cir. 1984).

To say that the Commission must adequately set forth its grounds is far different from saying that the agency's discretion as to remedy is curtailed by judge-made rules, such as a rule that a permanent bar may be imposed only if the agency has explained to the satisfaction of a court why no lesser remedy will do. If that is what <u>Steadman</u> intended, then we respectfully disagree. As the <u>Butz</u> Court said in reversing a court of appeals that had overturned an administrative agency's choice of sanctions, "[w]e search in vain for that requirement in the statute." <u>Butz</u>, 411 U.S. at 186. Section 15(b)(6)(A) of the Securities Exchange Act authorizes the Commission to issue a permanent bar if it finds that such a bar "is in the public interest." 15 U.S.C. § 78o(b)(6)(A). Considerable deference

should be given the Commission's ultimate judgment about what will best protect the public.[1]

We also note that the term "permanent bar" is more than a bit of a misnomer. It does not literally mean that the sanctioned person may never reenter the securities industry. In fact, there are two routes back in. First, Rizek may later apply to the SEC for consent to associate with an entity that is not a member of a self-regulatory organization such as the National Association of Securities Dealers (NASD). See SEC Rule of Practice 193, 17 C.F.R. § 201.193(a). Second, Rizek may find a NASD member firm willing to employ him, and that firm may apply to NASD to have Rizek become associated with it. See By-Laws of The National Association of Securities Dealers, Inc., art. III, § 3(d). NASD's approval of any such application is subject to whatever further action the Commission may take. See id., art. III, § 3(f).[2] This is a remarkably porous definition of a permanent bar.

The Commission said it was imposing a permanent bar on Rizek because of the egregiousness of his violation; because

---

[1] That is not to say there is no room for a court to find that a particular sanction is an abuse of discretion. See, e.g., Hateley v. SEC, 8 F.3d 653, 655-57 (9th Cir. 1993) (reducing a disgorgement order which was approximately ten times the amount of the petitioner's unjust enrichment).

[2] If the Commission wishes to order review of a NASD determination, it must do so within 40 days of receiving notice of the determination. See 17 C.F.R. § 201.421.

there was little basis to credit his claim of remorse (he was remorseful about the losses, but not about using the strategy which caused the losses); and because Rizek, who was at the time president of his own investment company,[3] posed a substantial threat to public investors.

The activity was egregious. These five clients were unsophisticated in the world of investing and trusted Rizek to handle their savings conservatively. In some instances these were their life savings, their funds for retirement, or their funds for educating their children. On average balances in the five accounts totaling $700,000, Rizek engaged in over $24 million in transactions over a ten month period. The transaction costs equaled roughly 40% of the account balances; one customer lost about 50% of his account. While his customers lost $195,000, Rizek received about $125,000 in commissions.

There is no doubt that Rizek churned the accounts. Churning is commonly said to have three elements: (1) control of the customer's account by the broker, either explicit or de facto; (2) excessive trading in light of the customer's investment objectives; and (3) scienter -- the required state of mind for liability under Section 10(b) and Rule 10b-5. See Tiernan v. Blyth, Eastman, Dillon & Co., 719 F.2d 1, 2 (1st Cir.

---

[3]    Rizek argues that his own firm is now defunct and so he cannot be a threat to others. The point, rather, is one of protecting the investing public, and the Commission has concluded that it would protect the public by precluding Rizek from further association with the industry.

-10-

1983); see also, e.g., Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489 (6th Cir. 1990); Laird v. Integrated Resources, Inc., 897 F.2d 826, 838 (5th Cir. 1990); Hotmar v. Lowell H. Listrom & Co., 808 F.2d 1384, 1385 (10th Cir. 1987). Rizek focuses on the third element.

The Supreme Court has said that scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). This circuit has accepted as meeting the requirement of scienter a form of recklessness that is not merely ordinary negligence, but is more like a lesser form of intent. See Greebel v. FTP Software, 194 F.3d 185, 199 (1st Cir. 1999). We have defined reckless conduct as "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious the actor must have been aware of it." Id. at 198 (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)).

Rizek argues that while the Commission may have been entitled to find that he had the degree of scienter needed to establish a churning violation, a greater degree of scienter is needed to justify the sanctions imposed. There is no statutory basis to distinguish between the scienter needed to establish a violation for which a sanction may be imposed administratively and the scienter needed to warrant a particular penalty. At

-11-

most, Rizek's argument goes to the Commission's exercise of its discretion. And the Commission found that even if Rizek had a good faith belief in the efficacy of his strategy, "he had no justification for recommending it to unsophisticated customers who were incapable of making an independent judgment, when he knew that the extremely high risk was directly contrary to the customers' conservative investment objectives." In re Al Rizek, Exchange Act Release No. 41,725, 70 S.E.C. Docket 705 (Aug. 11, 1999), available in 1999 WL 600427 at *6. That finding is adequate support for the remedy.

In any event, this case involves churning plus. The Commission also found that "Rizek was well aware that he had acted improperly in recommending his strategy, and tried to conceal his conduct from his firm." Id. Rizek both misled his firm's management and attempted to mislead the Commission. Paine Webber management had become concerned about Rizek's trading strategy and questioned him about it at four meetings. Rizek responded by giving the firm a list of clients whose strategies, he said, had changed so that "speculation" was now a high ranking objective. In addition, at the hearings before the ALJ, Rizek testified that he had called all of the customers in November 1993 and all of them agreed to the reordering of their investment objectives. But the facts were to the contrary: none of the customers testified that Rizek had sought or received their permission to change their investment objectives. There was ample evidence to support the

-12-

Commission's conclusion that Rizek acted willfully and recklessly.

Under these circumstances, there is simply no viable argument that the permanent bar was an abuse of discretion, or that it was punitive and not meant to protect the investing public.  See, e.g., Sheldon v. SEC, 45 F.3d 1515, 1519 (11th Cir. 1995) (affirming permanent bar); Sartain v. SEC, 601 F.2d 1366, 1376 (9th Cir. 1979) (same); O'Leary v. SEC, 424 F.2d 908, 912 (D.C. Cir. 1970) (same); Fink v. SEC, 417 F.2d 1058, 1060 (2d Cir. 1969) (same).

## III.

Rizek also challenges the imposition of a $100,000 civil penalty.  Under Section 21B(b) of the Act, there is a three-tiered system for assessing civil penalties, ranging from a first tier penalty of $5,000 to a third tier penalty of $100,000.  See 15 U.S.C. § 78u-2(b).  The requirements for imposition of the third tier penalty are set forth at 15 U.S.C. § 78u-2(b)(3):

(3)  Third tier

Notwithstanding paragraphs (1) and (2), the maximum amount of penalty for each such act or omission shall be $100,000 for a natural person or $500,000 for any other person if --

(A)  the act or omission described in subsection (a) of this section involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and
(B)  such act or omission directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission.

In turn, the statute sets forth six factors which the Commission may consider in assessing monetary penalties:

(1) whether the act or omission for which such penalty is assessed involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;

(2) the harm to other persons resulting either directly or indirectly from such act or omission;

(3) the extent to which any person was unjustly enriched, taking into account any restitution made to persons injured by such behavior;

(4) whether such person previously has been found by the Commission, another appropriate regulatory agency, or a self-regulatory organization to have violated the Federal securities laws, State securities laws, or the rules of a self-regulatory organization, has been enjoined by a court of competent jurisdiction from violations of such laws or rules, or has been convicted by a court of competent jurisdiction of violations of such laws or of any felony or misdemeanor described in section 78o(b)(4)(B) of this title;

(5) the need to deter such person and other persons from committing such acts or omissions; and

(6) such other matters as justice may require.

Id. § 78u-2(c). To the extent Rizek argues he is unable to pay the penalty, we note that he did not raise the argument before the Commission, and so it is waived. See 15 U.S.C. § 78y(c)(1). For the same reasons there was no abuse of discretion in the permanent bar order, there was no abuse of discretion in the imposition of the civil penalty.

We affirm the Commission's order.

-14-