# United States Court of Appeals
## For the First Circuit

No. 15-1080

JOHN P. FLANNERY,

Petitioner,

v.

SECURITIES & EXCHANGE COMMISSION,

Respondent.

No. 15-1117

JAMES D. HOPKINS,

Petitioner,

v.

SECURITIES & EXCHANGE COMMISSION,

Respondent.

PETITIONS FOR REVIEW OF AN ORDER OF
THE SECURITIES AND EXCHANGE COMMISSION

Before

Lynch, Stahl, and Kayatta,
Circuit Judges.

Mark W. Pearlstein, with whom Laura McLane, Fredric D.
Firestone, David H. Chen, and McDermott Will & Emery LLP were on
brief, for petitioner John P. Flannery.
John F. Sylvia, with whom Andrew N. Nathanson, Jessica C.
Sergi, and Mintz Levin Cohn Ferris Glovsky & Popeo PC were on

brief, for petitioner James D. Hopkins.

Lisa K. Helvin, Senior Counsel, with whom Michael A. Conley, Deputy General Counsel, John W. Avery, Deputy Solicitor, and Benjamin L. Schiffrin, Senior Litigation Counsel, Securities and Exchange Commission, were on brief, for respondent.

Jonathan G. Cedarbaum, Christopher Davies, Daniel Aguilar, John Byrnes, Wilmer Cutler Pickering Hale and Dorr LLP, Kate Comerford Todd, Steven P. Lehotsky, and U.S. Chamber Litigation Center, Inc., on brief for the Chamber of Commerce of the United States of America, amicus curiae in support of petitioners.

———————————

December 8, 2015

———————————

**LYNCH**, <u>Circuit Judge</u>.    In 2010, the United States Securities and Exchange Commission ("SEC" or "Commission") issued an Order Instituting Proceedings against two former employees of State Street Bank and Trust Company ("State Street"): (1) James D. Hopkins, a former vice president and head of North American Product Engineering, and (2) John P. Flannery, a former chief investment officer ("CIO").    The Commission alleged that during the 2007 subprime mortgage crisis, Hopkins and Flannery "engaged in a course of business and made material misrepresentations and omissions that misled investors" about two substantially identical State Street-managed funds collectively known as the Limited Duration Bond Fund ("LDBF").    Hopkins and Flannery were charged with violating Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)), Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), and Exchange Act Rule 10b-5 (17 C.F.R. § 240.10b-5).    After an eleven-day hearing, involving nineteen witnesses and about five hundred exhibits, the SEC's Chief Administrative Law Judge ("ALJ") dismissed the proceeding, finding that neither Hopkins nor Flannery was responsible for, or had ultimate authority over, the documents at issue and that these documents did not contain materially false or misleading statements or omissions.

The SEC Division of Enforcement ("Division") appealed the ALJ's decision to the Commission.  In 2014, the Commission, in

a 3-2 decision, reversed the ALJ with regard to a slide that Hopkins used at a May 10, 2007, presentation to a group of investors, and two letters, dated August 2 and August 14, 2007, that Flannery wrote or had seen before they were sent to investors. See In re John P. Flannery & James D. Hopkins, Securities Act Release No. 9689, Exchange Act Release No. 73,840, Investment Company Act Release No. 31,374, 2014 WL 7145625 (Dec. 15, 2014). The Commission found Hopkins liable under Securities Act Section 17(a)(1) ("Section 17(a)(1)"), Securities Exchange Act Section 10(b) ("Section 10(b)"), and Exchange Act Rule 10b-5 ("Rule 10b-5"); it found Flannery liable under Securities Act Section 17(a)(3) ("Section 17(a)(3)"). The Commission imposed cease-and-desist orders on Hopkins and Flannery, suspended Hopkins and Flannery from association with any investment adviser or company for one year, imposed a $65,000 civil monetary penalty on Hopkins, and imposed a $6,500 civil monetary penalty on Flannery. These petitions for review followed.

We conclude that the Commission's findings are not supported by substantial evidence. With regard to Hopkins, we find that the Division's materiality showing was marginal, and that there was not substantial evidence supporting scienter in the form of recklessness. With regard to Flannery, we conclude that at least the August 2 letter was not misleading, and therefore, as we explain, we need not reach the issue of whether the August 14

letter was misleading.  We grant the petitions for review and vacate the Commission's order.

I.

We take the underlying facts from the record before the Commission.  See Rizek v. SEC, 215 F.3d 157, 159 (1st Cir. 2000).

State Street Global Advisors ("SSgA") is the investment management arm of State Street Corporation.[1]  It advises and manages State Street-affiliated registered mutual funds and unregistered collective trust funds.[2]  On March 1, 2002, SSgA created the LDBF, a combination of two unregistered fixed-income funds that were invested in various fixed-income products.  The LDBF was offered and sold only to institutional investors. Investments in the LDBF came from three sources: first, other State Street funds invested directly in the LDBF; second, clients of internal advisory groups invested in the LDBF based on SSgA's recommendation to those groups; and third, independent institutional investors invested directly in the LDBF.

The LDBF was heavily invested in asset-backed securities ("ABS"), which included residential mortgage-backed securities ("RMBS").  Until 2007, the LDBF had outperformed its benchmark

---

[1]     State Street is a wholly owned subsidiary of State Street Corporation.  State Street Corporation is a publicly traded corporation.

[2]     State Street and SSgA were used interchangeably during the proceeding.

- 5 -

index.  In January and February 2007, it underperformed its benchmark index because of its investment in certain lower-rated securities.  April and May 2007, however, were two of the best months in the LDBF's history.  Then, beginning in June 2007, during the subprime mortgage crisis, the LDBF experienced substantial underperformance.  The Division's charges against Hopkins and Flannery involve communications about the LDBF that Hopkins and Flannery either made or were involved with in 2007.

A.   Vice President Hopkins

Hopkins worked at State Street from 1998 until 2010, when he was offered retirement as a result of the SEC proceeding. From 2006 to 2007, he was a vice president and head of North American Product Engineering.  During that time, Hopkins was the senior product engineer responsible for fixed-income funds, including the LDBF.  He served as a liaison between the portfolio managers and the client-facing people, which included salespeople and consultant relations people.  Hopkins was one of several people that would make presentations to potential clients.  He was also responsible for correcting inaccuracies in LDBF "fact sheets," two-page quarterly documents made available to clients and prospective clients that showed the LDBF's strategy and performance numbers.  Apart from the SEC charges, Hopkins worked in the securities industry for thirty-five years with an unblemished record.

SSgA used a standard PowerPoint presentation when presenting information about the LDBF. In 2006 and 2007, this presentation included a slide titled "Typical Portfolio Exposures and Characteristics -- Limited Duration Bond Strategy" ("Typical Portfolio Slide"). We describe the slide:

Under the slide title, it read:

- Exposure to non-correlated fixed income asset classes
- High quality
- No interest rate risk

Below, it had a box containing the following table:

|  | **Limited Duration Bond Fund** |
|---|---|
| Average quality | AA |
| Modified adjusted duration | 0.09 years |
| Yield over One Month LIBOR | 50 bps |
| Average life | 2.5 years |

It then had a heading "Breakdown by market value" and contained two bar graphs. The graph on the left was titled "By sector" and contained the following information:

- ABS: 55%
- CMBS: 25%
- MBS: 10%
- Agency: 5%
- Corporates: 0%
- Cash: 5%

The graph on the right was titled "By quality" and contained the following information:

- AAA: 45%
- AA: 40%

- A: 10%
- BBB: 5%

Importantly, the Typical Portfolio Slide portrayed percentages for both sector allocations and quality of investments. It is the sector allocations (going to diversification) which disturb the SEC. The typical sector allocation graph showed that the LDBF was 55% invested in ABS, 25% invested in commercial mortgage-backed securities ("CMBS"), and 10% invested in mortgage-backed securities ("MBS"). In 2006 and 2007, the LDBF's actual investment in ABS reached 80% to nearly 100%. One expert testified that along with "Conditional Value at Risk," credit ratings are used to determine the risk of a portfolio like the LDBF.

Hopkins did not update the Typical Portfolio Slide's sector breakdown from at least December 2006 through the summer of 2007. He would, however, bring notes on the actual investments when he made presentations, but he did not necessarily discuss the information in his notes if it did not come up in a question. Hopkins used the Typical Portfolio Slide at several presentations. He did not recall ever being asked a question about the LDBF's actual portfolio composition, including at the specific presentation next described.

On May 10, 2007, Hopkins made a presentation to the National Jewish Medical and Research Center ("NJC"), which was a

client of Yanni Partners, an institutional investment consulting firm. David Hammerstein, Yanni Partners' chief strategist, who was at the meeting, testified that Hopkins presented the Typical Portfolio Slide. According to Hammerstein, Hopkins used the slide to demonstrate that the LDBF was of very high quality and diversified. It is true the Typical Portfolio Slide labeled the LDBF as "high quality."

The Division alleged that Hopkins violated Section 17(a), Section 10(b), and Rule 10b-5 in several ways, including by being responsible for and using fact sheets that contained false and misleading information; by misleading investors with the Typical Portfolio Slide; by failing to update a slide that stated the LDBF had reduced its exposure to the index of lower-rated securities that had contributed to the January and February 2007 underperformance; and by making or acting negligently in connection with materially misleading statements in two different letters. The ALJ found that Hopkins was not responsible for the documents at issue and that he did not make any material misrepresentations or omissions.

After the Division appealed the ALJ's decision dismissing the proceeding, the Commission found that the Typical Portfolio Slide included material misrepresentations that Hopkins knew were misleading and that he "made" the misrepresentations in the slide, at least with regard to the May 10, 2007, presentation

- 9 -

to the NJC. The Commission held Hopkins liable for this presentation under Section 17(a)(1), Section 10(b), and Rule 10b-5. See 15 U.S.C. § 77q(a)(1); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

## B. CIO Flannery

Flannery joined SSgA in 1996 as a product engineer. In 2005, he became SSgA's Fixed Income CIO for the Americas. As CIO, Flannery had general supervisory oversight for SSgA's operations. However, he was not involved in the LDBF's investment decisions or its daily management. Flannery worked at SSgA until his position was eliminated in 2007. Before joining SSgA, Flannery had worked in the fixed-income area for about sixteen years, first in bond sales, then in managing fixed-income investments. He had an unblemished record in the industry and a reputation for being very honest and having a great deal of integrity.

In May 2006, Flannery expressed that he was concerned about mortgage risk in the real estate market and requested SSgA's fixed-income team to provide him with an analysis on the subject. After the LDBF began underperforming in June 2007, Flannery requested on June 25, 2007, that members of SSgA's management team and a member of its risk team re-examine the subprime market. That day, the head of Global Structured Projects gave Flannery a memorandum that stated, "[w]e remain constructive on the fundamentals" and that foreclosures were lower than the 10-year

- 10 -

average except in California and the Rust Belt states. The memorandum indicated that "we think there will be continued weakness in certain parts of the country . . . but we don't believe there is an imminent 'melt down' scenario. Subprime borrowers need loans, lenders are making loans, the street continues to fund these loans via the securitization market, and we expect this to continue going forward."

By the end of July 2007, as the subprime crisis worsened, Flannery became personally involved with managing the LDBF and had daily contact with the SSgA risk team during the summer and fall of 2007. He filled in as chair at a July 25, 2007, SSgA Investment Committee meeting. According to meeting minutes, Flannery discussed two ways to provide liquidity if clients wanted to leave the LDBF: (1) by selling the LDBF's top-rated (AAA) bonds; or (2) by selling a pro-rata share of assets across the portfolio. Flannery noted that although AAA-rated bonds were liquid, if the liquidity gained from the sales were siphoned off, then they would be left with a lower quality portfolio. After discussion among the meeting's participants, the Investment Committee decided on an approach incorporating both options, where they would increase liquidity in the fund and sell a pro-rata share of assets to cover any withdrawals from the fund. The committee also agreed to reduce the LDBF's exposure to AA-rated assets. In the two days following the July 25 meeting, the portfolio management team sold about $1.6

- 11 -

billion in AAA-rated bonds and $200 million in AA-rated bonds, which paid for investor redemptions and repurchase commitments. These transactions caused the LDBF's portfolio composition to change from approximately 48% investment in AAA-rated securities to less than 5%, and from 46% investment in AA-rated securities to more than 80%.

    1.   <u>August 2, 2007, Letter (Not From Flannery)</u>

On August 2, 2007, Relationship Management sent a letter to clients in at least twenty-two fixed-income funds, signed by the individual Relationship Managers and including fund specific performance information. A draft of this letter had been sent to the legal department as well as several people to review. Flannery had also received a draft, and he made a number of edits, some of which stayed in the final version. However, Flannery had not been included on several e-mail exchanges related to edits on the letter prior to its distribution. The final version of the letter included the following paragraph:

> We believe that what has occurred in the subprime mortgage market to date this year has been more driven by liquidity and leverage issues than long term fundamentals. Additionally, the downdraft in valuations has had a significant impact on the risk profile of our portfolios, prompting us to take steps to seek to reduce risk across the affected portfolios. To date, in the Limited Duration Bond Strategy, we have reduced a significant portion of our BBB-rated securities and we have sold a significant amount of our AAA-rated cash positions. Additionally, AAA-rated

exposure has been reduced as some total return swaps rolled off at month end. Throughout this period, the Strategy has maintained and continues to be AA in average credit quality according to SSgA's internal portfolio analytics. The actions we have taken to date in the Limited Duration Bond Strategy simultaneously reduced risk in other SSgA active fixed income and active derivative-based strategies.

2.    August 14, 2007, Letter (From Flannery)

On August 14, 2007, Flannery sent a letter to LDBF investors, in an attempt to explain what was taking place in the housing-related securities market. Flannery was normally not responsible for client communications, and the Chief Executive Officer ("CEO") of SSgA said it would not be a good idea, asking why Flannery would want to "raise [his] head up." Flannery understood the CEO to be saying that "this [was] kind of an ugly situation . . . why stand up and take a bullet," but Flannery wrote the letter because he thought it was "the right thing to do." Flannery said that "up to the limits that [he] was given by legal, [he] wanted to take responsibility for this disaster . . . and . . . to tell something of the arc of the story to put it in context." He said he "wanted to be as just completely straightforward as [he] could be." The draft of the letter Flannery prepared included the following paragraph:

> The situation is extreme and difficult to manage. While we believe that the subprime markets clearly convey far greater risk than they have historically[,] we feel that forced

> selling in this chaotic and illiquid market is unwise. Even if mortgage delinquencies soar beyond our expectations we would expect significantly higher values for our sub-prime holdings. While recent events may have repriced the risk of these assets for the foreseeable future and it is unlikely that they will retrace to values at the turn of the year we believe that liquidity will slowly re-enter the market and the segment will regain its footing. While we will continue to liquidate assets for our clients when they demand it, our advice is to hold the positions for now.

The last sentence was then edited to read, "While we will continue to liquidate assets for our clients when they demand it, our advice is to hold the positions in anticipation of greater liquidity in the months to come." Deputy General Counsel Mark Duggan revised that sentence to read, "While we will continue to liquidate assets for our clients when they demand it, we believe that many judicious investors will hold the positions in anticipation of greater liquidity in the months to come." Flannery kept Duggan's change because Flannery believed both his original language and the revised language were accurate. In addition to Duggan, a number of people reviewed the letter, including the co-heads of Relationship Management, SSgA's president and CEO, and outside legal counsel.

    3.  SEC Proceeding

        In the Division's appeal of the ALJ's decision, the Commission held Flannery liable under Section 17(a)(3) for

- 14 -

misleading statements in both the August 2 and August 14 letters. With regard to the August 2 letter, the Commission found the statement that SSgA reduced its risk in part by selling "a significant amount" of its "AAA-rated cash positions" was "misleading because LDBF's sale of the AAA-rated securities did not reduce risk in the fund. Rather, the sale ultimately increased both the fund's credit risk and its liquidity risk because the securities that remained in the fund had a lower credit rating and were less liquid than those that were sold." The Commission found that "even if [Flannery] did suggest minor edits to the letter that were never incorporated, and even if others were 'heavily involved' in its drafting . . . those facts . . . do not excuse his decision to approve misleading language."

With regard to the August 14 letter, the Commission found the "many judicious investors" language Duggan inserted was misleading "because it suggested that SSgA viewed holding onto the LDBF investment as a 'judicious' decision when, in fact, officials at SSgA had taken a contrary view, redeeming SSgA's own shares in LDBF and advising SSgA advisory group clients to redeem their interests, as well." The Commission found that the misrepresentations in both letters were material and that Flannery acted negligently in both cases. The SEC went on to hold, as a matter of law, that two misstatements were sufficient to find a violation of Section 17(a)(3)'s prohibition on "engag[ing] in any

. . . course of business which operates or would operate as a fraud or deceit upon the purchaser."  We need not reach that issue of law.

II.

"The SEC's factual findings control if supported by substantial evidence, . . . and its orders and conclusions must not be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Cody v. SEC, 693 F.3d 251, 257 (1st Cir. 2012) (citations omitted) (quoting 5 U.S.C. § 706(2)(A) (2006)).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 718 (1st Cir. 1999) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)).  We consider the whole record, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Universal Camera, 340 U.S. at 488.

When the Commission and the ALJ "reach different conclusions, . . . the [ALJ]'s findings and written decision are simply part of the record that the reviewing court must consider in determining whether the [SEC]'s decision is supported by substantial evidence."  NLRB v. Int'l Bhd. of Teamsters, Local 251, 691 F.3d 49, 55 (1st Cir. 2012) (citing Universal Camera, 340 U.S. at 493).  Because "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has

- 16 -

observed the witnesses and lived with the case has drawn conclusions different from the [Commission]'s than when [the ALJ] has reached the same conclusion," id. at 55 (quoting Universal Camera, 340 U.S. at 496), "where the [Commission] has reached a conclusion opposite of that of the ALJ, our review is slightly less deferential than it would be otherwise," id. (quoting Haas Elec., Inc. v. NLRB, 299 F.3d 23, 28–29 (1st Cir. 2002)).

A.   Hopkins

Liability under Section 17(a)(1), Section 10(b), and Rule 10b-5 requires materiality and scienter.  See SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008); see also Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011).  "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  "Scienter is an intention 'to deceive, manipulate, or defraud.'"  Ficken, 546 F.3d at 47 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)); see also Aaron v. SEC, 446 U.S. 680, 686 n.5 (1980).  Hopkins concedes that scienter can be established by proving "a high degree of recklessness," but denies that he was reckless.  Compare Ficken, 546 F.3d at 47 ("In this circuit, proving scienter

- 17 -

requires 'a showing of either conscious intent to defraud or "a high degree of recklessness."'" (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008))), with Matrixx Initiatives, 131 S. Ct. at 1323 ("We have not decided whether recklessness suffices to fulfill the scienter requirement.").

Questions of materiality and scienter are connected. City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011). "If it is questionable whether a fact is material or its materiality is marginal, that tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact." Id.

Here, assuming the Typical Portfolio Slide was misleading,[3] evidence supporting the Commission's finding of materiality was marginal. The Commission's opinion states that

_____

    [3] While the actual investment in ABS exceeded that which was on the slide, the slide was clearly labeled "Typical Portfolio Exposures and Characteristics -- Limited Duration Bond Strategy" and did not purport to show the actual exposures to each sector at any given time. The Commission contends that the allocation the slide represented was still not typical during the 2006–2007 time period. In response to the ALJ's question of whether the sector breakdown "was, in fact, what existed at that time," Hopkins responded, "I think it probably was -- in terms of the sector breakdown on this page, it was not . . . what was typical." We assume this was an admission that the slide was misleading as to its "typicality."
    We also assume that the Commission did not err in its finding that Hopkins in fact presented the Typical Portfolio Slide in his presentation to the NJC on May 10, 2007.

- 18 -

"reasonable investors would have viewed disclosure of the fact that, during the relevant period, LDBF's exposure to ABS was substantially higher than was stated in the slide as having significantly altered the total mix of information available to them."  Yet the Commission identifies only one witness other than Hopkins relevant to this conclusion.  Hammerstein, Yanni Partners' chief strategist,[4] testified that at the May 10 meeting, Hopkins spoke for about thirty minutes,[5] presented the Typical Portfolio Slide, and said that the fund was of very high quality.  Hammerstein said that the information on the Typical Portfolio Slide was important to him because "[i]t led to the impression that the fund was well diversified, and therefore that State Street took steps to reduce the risks or control the risks."  Hammerstein testified that when he later learned that the LDBF's ABS exposure actually approached 100 percent, he was surprised in light of the May 10 meeting.  This led Yanni Partners to advise its clients to liquidate their positions in the LDBF.  Hammerstein said they came to this conclusion because they "felt that State Street did not adequately inform [them] of the risks in the portfolio, and [they]

---

[4]    Hammerstein himself was not actually an investor.  He was the chief strategist at Yanni Partners, which is an investment consulting firm that works with investors.  The Commission points to no actual investors to support a finding of materiality.

[5]    Amanda Williams, who co-presented with Hopkins, wrote in a note the day after the meeting that they had only about fifteen minutes for their presentation.

cited the example of the presentation that State Street made to National Jewish on May 10 when State Street stated that . . . the typical allocation was 55 percent to the ABS sector, but as recently as March 31 of 2007, the actual ABS allocation was 100 percent." The Division presented a letter Yanni Partners sent to every client invested in the LDBF, signed by the field consultant responsible for the specific client, recommending that they liquidate their holdings and citing the May 10 meeting where "[t]he LD Bond Fund Portfolio Manager . . . did not disclose the actual sector exposure at the time, instead presenting 'typical' portfolio characteristics . . . ."

On the other hand, the slide was clearly labeled "Typical." As far as Hammerstein was aware, through May 2007, Yanni Partners never asked SSgA for a breakdown of the LDBF's actual investment by sector nor was he aware of any request from Yanni Partners for the LDBF's audited financial statements. Further, the Commission has not identified any evidence in the record that the credit risks posed by ABS, CMBS, or MBS were materially different from each other,[6] arguing instead that the

---

[6]  We also note that the LDBF's composition in terms of credit quality of holdings remained relatively constant, and, if anything, improved. The Typical Portfolio Slide represented that 85% of the LDBF's investment was in AAA- and AA-rated bonds (45% and 40% respectively), while the March 31, 2007, fact sheet disclosed that 94.46% of its investment was in AAA- and AA-rated bonds (62.2% and 32.26% respectively).

percent of investment in ABS and diversification as such are important to investors.

Context makes a difference. According to a report Hammerstein authored the day after the meeting, the meeting's purpose was to explain why the LDBF had underperformed in the first quarter of 2007 and to discuss its investment in a specific index that had contributed to the underperformance. The Typical Portfolio Slide was one slide of a presentation of at least twenty. Perhaps unsurprisingly, the slide was not mentioned in Hammerstein's report.

Hopkins presented expert testimony from John W. Peavy III ("Peavy") that "[p]re-prepared documents such as . . . presentations . . . are not intended to present a complete picture of the fund," but rather serve as "starting points," after which due diligence is performed. Peavy explained that "a typical investor in an unregistered fund would understand that it could specifically request additional information regarding the fund."[7] And not only were clients given specific information upon request, information about the LDBF's actual percent of sector investment was available through the fact sheets and annual audited financial

---

[7] Peavy also opined that "in the hundreds of . . . meetings and presentations [he has] attended, [he did] not recall a single instance in which the discussion was based solely on the content of material prepared beforehand or a rote reading of a PowerPoint presentation slide deck."

statements.[8]  The March 31, 2007, fact sheet, available six weeks prior to the May 10, 2007, presentation, included that the LDBF was 100% invested in ABS.  The June 30, 2007, fact sheet included that the LDBF was 81.3% invested in ABS.  These facts weigh against any conclusion that the Typical Portfolio Slide had "significantly altered the 'total mix' of information made available."  <u>Basic</u>, 485 U.S. at 232 (quoting <u>TSC Indus., Inc.</u>, 426 U.S. at 449) (internal quotation mark omitted).

This thin materiality showing cannot support a finding of scienter here.[9]  See <u>Geffon</u> v. <u>Micrion Corp.</u>, 249 F.3d 29, 35 (1st Cir. 2001).  Hopkins testified that in his experience,

---

[8]    Information was also provided on SSgA's website through the password protected "Client's Corner" and "Consultant's Corner" sections.  However, the information available on these parts of the website varied by fund and client.  Hopkins presented evidence that during 2007, the Client's Corner section was logged into 28,969 times by 465 unique users.  Hopkins also presented evidence that Hammerstein was copied on an e-mail about the Client's Corner section of the website, but Hammerstein had no recollection of seeing the e-mail.
     We do not suggest that the mere availability of accurate information negates an inaccurate statement.  Rather, when a slide is labeled "typical," and where a reasonable investor would not rely on one slide but instead would conduct due diligence when making an investment decision, the availability of actual and accurate information is relevant.

[9]    Our determination is based on how a reasonable investor would react.  Given our conclusion that the Commission abused its discretion in holding Hopkins liable under Section 17(a)(1), Section 10(b), and Rule 10b-5, we need not decide whether the level of sophistication of the LDBF investors would have made any misrepresentation immaterial.  <u>Cf.</u> <u>SEC</u> v. <u>Happ</u>, 392 F.3d 12, 21–23 (1st Cir. 2004).

investors did not focus on sector breakdown when making their investment decisions and that LDBF investors did not focus on how much of the LDBF investment was in ABS versus MBS.[10]  In fact, Hopkins did not recall ever discussing the Typical Portfolio Slide or being asked a question about the actual sector breakdown when presenting the slide.[11]  He did not update the Typical Portfolio Slide's sector breakdowns because he did not think the typical sector breakdowns were important to investors.  To the extent that an investor would want to know the actual sector breakdowns, Hopkins would bring notes with "the accurate information" so that he could answer any questions that arose.  We cannot say that these handwritten notes provide substantial evidence of recklessness, much less intentionality to mislead -- particularly in light of Hopkins's belief that this information was not important to investors.  Cf. City of Dearborn Heights, 632 F.3d at 757 ("[T]he question of whether Defendants recklessly failed to disclose [a fact] is . . . intimately bound up with whether Defendants either actually knew or recklessly ignored that the [fact] was material

---

[10]  Hopkins was not alone in his belief.  Lawrence J. Carlson, the co-head of Relationship Management at SSgA in 2007, testified that at least prior to the summer of 2007, he did not recall clients ever asking for a sector breakdown of the LDBF, and expert witness Peavy testified that it was common for clients "not to ask for holdings."

[11]  Outside of the presentations, prior to the May 10 meeting, there were at least occasional inquiries about the LDBF's holdings, to which Hopkins provided answers.

and nevertheless failed to disclose it." (alterations in original) (quoting City of Phila. v. Fleming Cos., 264 F.3d 1245, 1265 (10th Cir. 2001))). Given the evidence weighing against the materiality of the portion of the slide to which the SEC objects, we cannot say there is substantial evidence that Hopkins's presentation of a slide containing sector breakdowns labeled "typical," with notes of the actual sector breakdown ready at hand, constitutes "a highly unreasonable [action], involving not merely simple, or even inexcusable[] negligence, but an extreme departure from the standards of ordinary care . . . that is either known to [Hopkins] or is so obvious [Hopkins] must have been aware of it." Ficken, 546 F.3d at 47-48 (second alteration in original) (quoting SEC v. Fife, 311 F.3d 1, 9-10 (1st Cir. 2002)). We conclude that the Commission abused its discretion in holding Hopkins liable under Section 17(a)(1), Section 10(b), and Rule 10b-5.

B.    Flannery

Section 17(a)(3) deems it unlawful "for any person in the offer or sale of any securities . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). "[N]egligence is sufficient to establish liability under . . . § 17(a)(3)." Ficken, 546 F.3d at 47.

The Commission concluded "that the August 2 and August 14 letters were materially misleading, particularly when their

cumulative effect is taken into account."  It found that "[w]hen considered together -- and as part of a larger effort to convince investors to remain in the poorly performing LDBF -- the letters misleadingly downplayed LDBF's risk and encouraged investors to hold onto their shares, even though SSgA's own funds and internal advisory group clients were fleeing the fund."  We disagree.  At the very least, the August 2 letter was not misleading -- even when considered with the August 14 letter -- and so there was not substantial evidence to support the Commission's finding that Flannery was "liable for having engaged in a 'course of business' that operated as a fraud on LDBF investors."[12]

The Commission's primary reason for finding the August 2 letter misleading was its view that the "LDBF's sale of the AAA-rated securities did not reduce risk in the fund.  Rather, the sale ultimately <u>increased</u> both the fund's credit risk and its liquidity risk because the securities that remained in the fund had a lower credit rating and were less liquid than those that were sold."  At the outset, we note that neither of the Commission's assertions -- that the sale increased the fund's credit risk and increased its liquidity risk -- are supported by substantial evidence.

---

[12]    In light of this conclusion, we do not reach Flannery's argument that the Commission's interpretation of Section 17(a)(3) as applying to misstatements is incorrect.

First, although credit rating alone does not necessarily measure a portfolio's risk, the Commission does not dispute the truth of the letter's statement that the LDBF maintained an average AA-credit quality. Second, expert testimony presented at the proceeding explained that the July 26 AAA-rated bond sale reduced risk because these bonds "entailed credit and market risk that were substantially greater than those of cash positions. In addition, a portion of the sale proceeds was used to pay down [repurchase agreement] loans and reduce the portfolio leverage." Further, testimony throughout the proceeding indicated that the LDBF's bond sales in July and August reduced risk by decreasing exposure to the subprime residential market, by reducing leverage, and by increasing liquidity, part of which was used to repay loans.

To be sure, the Commission maintained that the bond sale's potentially beneficial effects on the fund's liquidity risk were immediately undermined by the "massive outflows of the sale proceeds . . . to early redeemers." But this reasoning falters for two reasons. First, the Commission acknowledged that between $175 and $195 million of the cash proceeds remained in the LDBF as of the time the letter was sent; it offered no reason, however, why this level of cash holdings provided an insufficient liquidity cushion. Second and more fundamentally, even if the Commission was correct that the liquidity risk in the LDBF was higher following the sale than it was prior to the sale, it does not

follow that the sale failed to reduce risk.  Rather, to treat as misleading the statement in the August 2 letter that State Street had "reduced risk," the Commission would need to demonstrate that the liquidity risk in the LDBF following the sale was higher than it would have been in the counterfactual world in which the financial crisis had continued to roil -- and in which large numbers of investors likely would have sought redemption -- and the LDBF had not sold its AAA holdings.  But the Commission has not done this.

Independently, the Commission has misread the letter. The August 2 letter did not claim to have reduced risk in the LDBF. The letter states that "the downdraft in valuations has had a significant impact on the risk profile of our portfolios, prompting us to take steps to seek to reduce risk across the affected portfolios" (emphasis added).  Indeed, at oral argument, the Commission acknowledged that there was no particular sentence in the letter that was inaccurate.  It contends that the statement, "[t]he actions we have taken to date in the [LDBF] simultaneously reduced risk in other SSgA active fixed income and active derivative-based strategies," misled investors into thinking SSgA reduced the LDBF's risk profile.  This argument ignores the word "other."  The letter was sent to clients in at least twenty-one other funds, and, if anything, speaks to having reduced risk in funds other than the LDBF.

Even beyond that, there is not substantial evidence that SSgA did not "seek to reduce risk across the affected portfolios." As one expert testified, there are different types of risk associated with a fund like the LDBF, including market risk, liquidity risk, and credit or default risk. The LDBF was facing a liquidity problem, and at the July 25 meeting, Michael Wands, the Director of Active North American Fixed Income, explained that "[i]t's hard to predict if the market will hold on or if there will be a large number of withdrawals by clients. We need to have liquidity should the clients decide to withdraw." Flannery noted that "if [they didn't] raise liquidity [they] face[d] a greater unknown." Robert Pickett, the LDBF's lead portfolio manager, noted that selling only AAA-rated bonds would affect the LDBF's risk profile. After discussion of both of these concerns, the Investment Committee ultimately decided to increase liquidity, sell a pro-rata share to warrant withdrawals, and reduce AA exposure. And that is what it did. On July 26 and 27, 2007, LDBF's portfolio management team sold approximately $1.6 billion in AAA-rated bonds and about $200 million in AA-rated bonds; between approximately July 31 and August 24, 2007, it sold about $1.2 billion of AA-rated bonds; and on August 7 and 8, 2007, it sold about $100 million of A-rated bonds. The August 2 letter does not try to hide the sale of the AAA-rated bonds; it candidly acknowledges it. At the proceeding, Flannery testified that

- 28 -

selling AAA-rated bonds itself reduces risk, and here, in combination with the pro-rata sale, was intended to maintain a consistent risk profile for the LDBF. Pickett testified that the goal of the pro-rata sale was to treat all shareholders -- both those who exited the fund and those who remained -- as equally as possible and maintain the risk-characteristics of the portfolio to the extent possible. These actions are not inconsistent with trying to reduce the risk profile across the portfolios.

Finally, we note that the Commission has failed to identify a single witness that supports a finding of materiality. Cf. SEC v. Phan, 500 F.3d 895, 910 (9th Cir. 2007) ("The SEC, which both bears the burden of proof and is the party moving for summary judgment, submitted no evidence to the district court demonstrating the materiality of the misstatement about the payment terms."). We do not think the letter was misleading, and we find no substantial evidence supporting a conclusion otherwise.

We need not reach the August 14 letter.[13] In its opinion, the Commission stated that while Section 17(a)(1) and Rule 10b-5(a) & (c) "would proscribe even a single act of making or drafting a material misstatement to investors, Section 17(a)(3) is not

---

[13] We also do not reach the defense of whether the last sentence of the relevant paragraph was no more than a non-actionable "opinion," protected under Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1327 (2015).

susceptible to a similar reading.  Of course, one who <u>repeatedly</u> makes or drafts such misstatements over a period of time may well have engaged in a fraudulent 'practice' or 'course of business,' but not every isolated act will qualify."  <u>See also</u> <u>In re Anthony Fields, CPA</u>, Securities Act Release No. 9727, Exchange Act Release No. 74,344, Investment Company Act Release No. 31,461, 2015 WL 728005, at *10 (Feb. 20, 2015) ("[A]n isolated misstatement unaccompanied by other conduct does not give rise to liability under [Section 17(a)(3)].").  Even were we to assume that the August 14 letter was misleading, in light of the SEC's interpretation of Section 17(a)(3) and our conclusion about the August 2 letter, we find there is not substantial evidence to support the Commission's finding that Flannery engaged in a fraudulent "practice" or "course of business."

### III.

For the reasons above, we <u>grant</u> the petitions for review and <u>vacate</u> the Commission's order.