[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15322
_____

Agency No. 3-15263

ZPR INVESTMENT MANAGEMENT INC.,
MAX E. ZAVANELLI,

Petitioners,

versus

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

_____

Petition for Review of a Decision of the
Securities and Exchange Commission

_____

(June 30, 2017)

Before MARTIN, JILL PRYOR, and MELLOY,[*] Circuit Judges.

MARTIN, Circuit Judge:

_____

[*] Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Max Zavanelli and his investment firm, ZPR Investment Management, Inc. ("ZPRIM"), are before us seeking review of a final order of the Securities and Exchange Commission ("SEC" or the "Commission").[1] The Commission found that Mr. Zavanelli and ZPRIM (the "petitioners") made material misrepresentations to prospective clients in violation of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80b-1. Based on these violations, the Commission imposed monetary and other sanctions. After careful consideration, and with the benefit of oral argument, we grant the petitioners some, but not all, of the relief they seek. We vacate the violations and monetary sanctions related to the newsletter ZPRIM published in December 2009, but we affirm all other violations and sanctions set out in the Commission's order.

## I. BACKGROUND

A. THE FACTS

### 1. Mr. Zavanelli and ZPRIM

In 1994, Mr. Zavanelli founded ZPRIM, an investment firm registered as an "investment adviser" with the SEC. Mr. Zavanelli was ZPRIM's president and sole shareholder. As such, he "had ultimate authority over all aspects of ZPRIM's advisory business, including its advertising." ZPRIM employed Ted Bauchle as its operations manager from 1999 until early 2013. According to Mr. Bauchle, Mr.

---

[1] For clarity, we use "SEC" to refer to the party opposing this appeal and "the Commission" to refer to the administrative tribunal whose decision we are reviewing.

2

Zavanelli was ZPRIM's "boss man."  Mr. Zavanelli "made all the decisions" and "was difficult to disagree" with "because he was under the impression that the company should be run his way and that he was always correct."

### 2.  Global Investment Performance Standards

The Global Investment Performance Standards ("GIPS") are "universal, voluntary standards to be used by investment managers for quantifying and presenting investment performance that ensure fair representation, full disclosure, and apples-to-apples comparisons."  GIPS has two related components, which are the performance standards and the advertising guidelines.  The performance standards establish how a firm should calculate and present its investment performance.  As you might have guessed, those firms that comply with the GIPS performance standards may represent themselves as being "GIPS-compliant."  It is generally understood that compliance with GIPS "provides a level of credibility" to the firm's performance results and gives prospective clients "a greater level of confidence" in the firm's performance presentations.

Under GIPS, if a firm chooses to advertise that it is GIPS compliant, that firm must also comply with the GIPS advertising guidelines.[2]  The advertising guidelines require any advertisement claiming GIPS compliance to disclose

---

[2] The GIPS rules say: "[S]hould a GIPS-compliant FIRM choose to advertise performance results, the FIRM MUST apply . . . the GIPS Advertising Guidelines in order to include a claim of compliance with the GIPS standards."

specific information about the firm's investment returns.  Specifically, the firm must provide: "(1) period-to-date composite performance results and (2) either one-, three-, and five-year cumulative annualized composite returns or five years of annual composite returns."

### 3.  ZPRIM Began Claiming It Was GIPS Compliant

Mr. Zavanelli knew that GIPS compliance was "very important" for marketing to institutional clients and he wanted ZPRIM to have those "bragging rights."  To that end, ZPRIM hired a GIPS verification firm, Ashland Partners & Company LLP ("Ashland"), to help bring ZPRIM into compliance.  In January, February, and April 2008, ZPRIM placed advertisements in financial magazines claiming it was GIPS compliant.  Together with the claim of GIPS compliance, and in keeping with GIPS advertising guidelines, the ads included period-to-date returns and at least five years of annual returns.

### 4.  In Fall 2008, ZPRIM Published Ads Omitting Information Required Under GIPS

In the fall of 2008, ZPRIM published three more magazine ads claiming GIPS compliance.  But these ads had no period-to-date performance results, nor did they include either one-, three-, and five-year annualized results or five years of annual results.  One effect of leaving out this GIPS-required information was that the ads hid ZPRIM's recent poor performance.  Had ZPRIM shown its investment returns over the time periods required by GIPS, the ads would have revealed that

4

the firm's performance lagged behind ZPRIM's benchmark index by as much as ten percentage points. Instead of disclosing the called-for returns with the unflattering information, ZPRIM showed its returns over a longer period of time during which ZPRIM outperformed its benchmark index.

Mr. Bauchle testified that before these ads were published, he told Mr. Zavanelli they didn't meet the GIPS requirements for showing investment return information. But Mr. Zavanelli dismissed Mr. Bauchle's concerns, saying it wasn't necessary to put the information in the ads because ZPRIM would give it to prospective clients before they invested. Mr. Zavanelli "wanted to run those ads," so ZPRIM published them even though they did not comply with the GIPS advertising guidelines. Although Ashland had reviewed and approved ZPRIM's earlier ads, ZPRIM never asked Ashland to review the fall 2008 ads.

### 5. ZPRIM Published Newsletters Omitting Information Required Under GIPS

Mr. Zavanelli wrote a monthly investment newsletter for ZPRIM that contained information about ZPRIM's performance results. This newsletter went to ZPRIM's clients, dozens of investment consultants, and others in the industry.

In November 2008, Ashland told ZPRIM that if "[GIPS] compliance is being claimed" in ZPRIM's newsletters, the "GIPS Advertising Guidelines need to be followed." Ashland then explained precisely how investment returns should be listed in the newsletters in order to comply with the GIPS advertising guidelines.

5

Nevertheless, ZPRIM sent out newsletters in April and December 2009 that claimed GIPS compliance, yet failed to include the required information.

In contrast to the April 2009 newsletter, the December 2009 newsletter contained several corrective statements. Although it is true the December 2009 newsletter said on one page that "[a]ll numbers are GIPS compliant," the next page contained a number of disclaimers. It said, for example: "The investment report you are reading is not GIPS compliant. It was never intended to be nor can it be. . . . Our report remains not GIPS compliant."

### 6. The SEC Notified ZPRIM of False Claim of GIPS Compliance

In January 2010, the SEC sent ZPRIM a letter. The letter noted that, while ZPRIM's December 2008 advertisement "claimed compliance" with GIPS, "the [SEC's] examination found that it did not comply with GIPS advertising guidelines." The letter told ZPRIM that "[a]s a result, ZPR[IM] may have violated Section 206 of the Advisers Act and Rule 206(4)-1, thereunder."

ZPRIM responded that it "did not intend to mislead with this ad." Beyond that, ZPRIM assured the SEC that "[w]e have changed our ads" going forward to comply with the GIPS advertising guidelines by including the "1-3-5 year annualized returns" as a "[c]orrective action[]."

In August 2010, the SEC sent ZPRIM another letter notifying the firm that the SEC was "conducting an investigation" into ZPRIM.

6

### 7. ZPRIM Represented in Two Morningstar Reports that It Was Not Under Investigation

In order to attract institutional clients, ZPRIM regularly gave information about itself to Morningstar, which is a major provider of independent investment research. Using the information it gets from investment firms, Morningstar creates a report about each firm, and investors use these reports to research potential money managers. It was Mr. Bauchle's job to submit ZPRIM's information to Morningstar.

One piece of information included in a Morningstar report is whether or not there are any "[p]ending SEC investigations" of a firm. This is important here because, even though the SEC told ZPRIM in August 2010 that it was investigating the firm, Mr. Bauchle continued to tell Morningstar there were "No" "[p]ending SEC investigations" of ZPRIM. Mr. Bauchle, on behalf of ZPRIM, made this misrepresentation to Morningstar twice: first for the period ending on September 30, 2010, and, again, for the period ending on March 31, 2011.

### 8. In Spring 2011, ZPRIM Published Additional Ads Omitting Information Required Under GIPS

Despite ZPRIM's assurances to the SEC that it would change its ads to comply with the GIPS advertising guidelines, ZPRIM published three more ads—in February, March, and May 2011—claiming GIPS compliance but failing to

include the returns required by the GIPS advertising guidelines.  Mr. Zavanelli

testified that he conceived of and approved these ads.

## B.  THE ADVISERS ACT

The Advisers Act sets "federal fiduciary standards for investment advisers."

Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 471 n.11, 97 S. Ct. 1292, 1300 n.11

(1977).  For our purposes here, we review the antifraud provisions of the Advisers

Act—sections 206(1), (2), and (4).[3]  In order to establish a violation, each of these

sections requires the SEC to show the investment adviser made a material

misrepresentation with a culpable mental state.  See Steadman v. SEC, 603 F.2d

1126, 1129–34 (5th Cir. 1979) (Steadman I), aff'd, 450 U.S. 91, 101 S. Ct. 999

(1981) (interpreting sections 206(1)–(2));[4] SEC v. Steadman, 967 F.2d 636, 643,

---

[3] Section 206 says:

> It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
> **. . .**
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.  The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

15 U.S.C. §§ 80b-6(1), (2) & (4).

[4] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

8

647 (D.C. Cir. 1992) (Steadman II) (interpreting section 206(4)).  While the material-misrepresentation element is the same for all three sections, the mental-state element for section 206(1) is different than that for sections 206(2) and (4).  See Steadman I, 603 F.2d at 1134; Steadman II, 967 F.2d at 647.  Section 206(1) requires the SEC to show the adviser acted with scienter.  Steadman I, 603 F.2d at 1134.  Sections 206(2) and (4) require no showing of scienter, and a showing of negligence is sufficient.  See id.; Steadman II, 967 F.2d at 643 & n.5, 647.

C.  PROCEEDINGS BEFORE THE COMMISSION

In April 2013, the SEC began administrative proceedings against ZPRIM and Mr. Zavanelli.  After a seven-day hearing, the Administrative Law Judge found both had violated the Advisers Act and imposed sanctions.  ZPRIM and Mr. Zavanelli appealed to the Commission, which affirmed.[5]

1.  Violations

The Commission found ZPRIM violated sections 206(1), (2), and (4) of the Advisers Act by making false or misleading claims (a) in the fall-2008 and spring-2011 magazine ads, and in the 2009 newsletters, that it was GIPS compliant; and (b) in the 2011 Morningstar report that it was not under SEC investigation.  The Commission also found ZPRIM violated sections 206(2) and (4), which, again, require only a showing of negligence, for the 2010 Morningstar report.

---

[5] There was one finding by the Administrative Law Judge that the Commission reversed, but that issue is not before us.

As for Mr. Zavanelli, the Commission found him liable under sections 206(1) and (2) for all the charges involving misrepresentations of GIPS compliance.  The Commission found him liable both directly and for aiding and abetting ZPRIM.  It found him not liable for ZPRIM's misrepresentations in the Morningstar reports.

### 2.  Sanctions

The Commission also affirmed the sanctions imposed on ZPRIM and Mr. Zavanelli.  First, the Commission placed an "industry bar" on Mr. Zavanelli, which prohibits him from associating "with any investment adviser, broker, dealer, municipal securities dealer, municipal advisor, transfer agent, and nationally recognized statistical rating organization."  Second, the Commission ordered ZPRIM and Mr. Zavanelli to cease and desist their misconduct.  Third, the SEC imposed civil penalties of $570,000 against Mr. Zavanelli and $250,000 against ZPRIM.  ZPRIM and Mr. Zavanelli timely petitioned this Court for review.

## II.  STANDARD OF REVIEW

When the Commission makes findings of fact, we must affirm them if they are "supported by substantial evidence."  Orkin v. SEC, 31 F.3d 1056, 1063 (11th Cir. 1994).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v.

10

NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 459 (1951) (quotation omitted).  We review de novo the Commission's legal conclusions.  Orkin, 31 F.3d at 1063.

"The fashioning of an appropriate and reasonable remedy is for the Commission, not this court . . . ."  Steadman I, 603 F.2d at 1140.  "We may overturn the [Commission's] decision to impose a particular sanction only upon finding a gross abuse of discretion."  Orkin, 31 F.3d at 1066.

### III.  DISCUSSION

Petitioners challenge the Commission's order on two grounds.  First, they say the Commission's factual findings about both materiality and mental state are not supported by substantial evidence.  More specifically, they say substantial evidence does not support the Commission's findings that: (1) the false claims of GIPS compliance in ZPRIM's advertisements were material; (2) the false claims of GIPS compliance in ZPRIM's newsletters were material; (3) the false claims of GIPS compliance in ZPRIM's ads and newsletters were made with scienter; and (4) the false claims in the Morningstar reports that ZPRIM was not under investigation were made with the required mental state.  Second, petitioners argue the Commission abused its discretion in imposing sanctions.  We address each argument in turn.

11

A.  MATERIALITY OF ZPRIM'S ADVERTISEMENTS

    1.  The Materiality Requirement

A false or misleading statement by an investment adviser violates the antifraud provisions of the Advisers Act only if the fact misrepresented or omitted is "material."  See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 200–01, 84 S. Ct. 275, 287 (1963); Steadman I, 603 F.2d at 1129–34.  An "omitted fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important."  Basic Inc. v. Levinson, 485 U.S. 224, 231, 108 S. Ct. 978, 983 (1988) (quotation omitted).  "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Id. at 231–32, 108 S. Ct. at 983 (quotation omitted).

    2.  Materiality as to ZPRIM's Advertisements

ZPRIM published ads claiming GIPS compliance but omitted the investment return information required by the GIPS advertising guidelines.  ZPRIM's claim of GIPS compliance was therefore false, and petitioners do not say otherwise.  Rather, they argue their omission of the GIPS-required information was not material.  We conclude to the contrary.  Substantial evidence showed that reasonable investors would find it important that ZPRIM's ads did not actually comply with GIPS even while they claimed compliance.

12

To begin, the evidence showed that the status of being "GIPS compliant" is important to investors.  Mr. Zavanelli himself testified that being able to market oneself as GIPS compliant "is very important" for attracting institutional clients. Mr. Bauchle explained that institutional clients "screen[]" for GIPS compliance and will not even consider firms that are not compliant.  Given the significance of GIPS compliance as a marker in the industry, reasonable investors would have wanted to know that ZPRIM's claim of GIPS compliance was false.

Beyond the value of the label itself, the false claim of GIPS compliance was also material because it caused prospective clients to wrongly believe the performance results in ZPRIM's ads adhered to the GIPS advertising guidelines. As the Commission explained, the purpose of the advertising guidelines is to give investors the assurance that any GIPS-compliant firm will present its performance data in a way that is "complete, fair[], and comparable to those of other firms." The guidelines' requirements for presenting performance data provide "uniformity and comparability among investment managers."  That meant investors looking at the ZPRIM ads could have believed they were looking at the uniform, standardized set of returns required by GIPS, when in fact ZPRIM was deviating from the standardized presentation and putting its investment performance in a more favorable light.  ZPRIM presented its numbers as an "apples-to-apples comparison" with the data posted by other GIPS-compliant firms, when its

13

numbers were not actually comparable.  This discrepancy is something a "reasonable [investor] would consider [] important."  Basic, 485 U.S. at 231, 108 S. Ct. at 983 (quotation omitted).

For the ads published in fall 2008, the showing of materiality was even stronger.  If ZPRIM had listed its investment returns in those ads as required by GIPS, the information would have revealed that ZPRIM was significantly underperforming its benchmark.  Certainly, a prospective investor would have wanted to know about those undisclosed, negative results.  See SEC v. Merch. Capital, LLC, 483 F.3d 747, 769 (11th Cir. 2007) (holding that defendants made material omissions by marketing interests in their company to investors "without disclosing the poor performance of the interests that had already been sold").

Petitioners argue that ZPRIM's failure to disclose the GIPS-required information in its ads was not a material omission because the firm provided the information later.  Petitioners say ZPRIM sent a fact sheet that disclosed the performance data required by GIPS to every prospective client who responded to a ZPRIM ad.  Petitioners also point to data the firm posted on its website.  Because ZPRIM eventually gave prospective clients the GIPS-required information, petitioners say that information was "part of the total mix of information provided," and therefore its omission from the ads was not material.  See Basic, 485 U.S. at 231–32, 108 S. Ct. at 983.

14

These after-advertisement disclosures do not carry the day.  Materiality is "determined in light of the circumstances existing at the time the alleged misstatement occurred."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 165 (2d Cir. 2000) (emphasis added); see also SEC v. Morgan Keegan & Co., 678 F.3d 1233, 1253 (11th Cir. 2012) (per curiam) (holding that disclosures made "after the alleged oral misrepresentations" do not render the misrepresentations immaterial).  Because our inquiry is limited to what investors knew at the time the false statements were made, ZPRIM's later disclosures cannot negate the materiality of the earlier misrepresentations.[6]  See Morgan Keegan, 678 F.3d at 1253.

Focusing the materiality inquiry on the time when the misrepresentations were made is especially important where, as here, the context of the false statements is advertising to attract new investors.  A later disclosure would not have cured the misrepresentation that already occurred at the advertising stage because, again, many institutional investors "screen[]" for GIPS compliance.  ZPRIM's false claims of GIPS compliance likely resulted in interest from investors

---

[6] It could be argued that ZPRIM's publishing of the GIPS-required information on its website was not a subsequent disclosure, since the website was available at the same time as the ads.  But, even assuming that ZPRIM put the correct information on its website, that would not render immaterial the false claims of GIPS compliance in ZPRIM's ads.  That is because the ads never alerted investors that they needed to look to ZPRIM's website for the GIPS-required disclosure; neither did the website alert investors that it contained the GIPS-required information omitted from ZPRIM's ads.  See Morgan Keegan, 678 F.3d at 1252 (finding disclosure of accurate information on firm's website did not render immaterial earlier misrepresentations where there was "no evidence that brokers directed customers" to the information on the web page).

15

who would not otherwise have considered or contacted ZPRIM. As the Commission explained, "[t]he adviser's false statement has succeeded because it has garnered interest, regardless of whether the adviser later provides enough information for an astute individual to detect its misstatement." The problems caused by a false ad cannot be cured by passing along corrected information to the very customers the company attracted through the misinformation in the first place. See id. at 1252 (holding that "adequate written disclosures" provided after a false statement did not render the false statement immaterial because the disclosure was "given to customers only upon a customer's request").

Petitioners also say the First Circuit's decision in Flannery v. SEC, 810 F.3d 1 (1st Cir. 2015), supports their argument. But the conduct at issue in Flannery was less egregious than the conduct we consider here. In Flannery, the Commission found that an investment firm made a material misrepresentation in a slide presentation to investors in which one slide said that a fund typically was 55% invested in a certain type of security, when the investment was actually around 100%. Id. at 5. The First Circuit reversed. Id. at 15. The court found the record supported only a "thin" showing of materiality because, among other things, (1) "the slide was clearly labeled 'Typical,'" and (2) the firm had already distributed the correct data to clients six weeks before the presentation with the inaccurate slide. Id. at 10–11.

16

ZPRIM did not label its return information "typical," which would have cautioned a reasonable investor he should conduct further research. See id. at 11 n.8. ZPRIM claimed it was presenting the actual, complete set of performance returns required by GIPS. By claiming GIPS compliance, ZPRIM falsely signaled to investors there was no need to look any further for the performance data GIPS requires. Also, here the GIPS-required figures were distributed only after ZPRIM made the misrepresentations—not weeks before—and then only to those prospective clients who came forward.

As the Flannery court explained, "the mere availability of accurate information" does not "negate[] an inaccurate statement." Id. And it does not do so here. This record contains substantial evidence to support the Commission's finding that ZPRIM's false claim of GIPS compliance in its ads was material.

B. MATERIALITY OF ZPRIM'S NEWSLETTER STATEMENTS

Petitioners also challenge the Commission's finding of materiality for the false claims of GIPS compliance in ZPRIM's April and December 2009 newsletters. They argue that the two newsletters did not actually claim to be compliant with GIPS. We reject this argument with respect to the April 2009 newsletter. However, the record supports petitioners' argument that the December 2009 newsletter sufficiently disclaimed GIPS compliance. The Commission's finding of materiality for that publication cannot therefore stand.

17

### 1. The April 2009 Newsletter

The April 2009 newsletter unmistakably asserted GIPS compliance. A footnote to a table listing ZPRIM's investment returns said that ZPRIM's "compliance with the Global Investment Performance Standards (GIPS®) has been verified firm-wide by Ashland Partners & Company LLP from December 31, 2000 through September 30, 2008." The table listed investment returns for periods falling within this window of purported GIPS compliance, but omitted the GIPS-required information. This false claim of GIPS compliance in the newsletter was material for the same reasons the false claims of GIPS compliance in the advertisements were material. Thus for the April 2009 newsletter as well, substantial evidence supported the Commission's finding of materiality.

### 2. The December 2009 Newsletter

The December 2009 newsletter is different. On page three of the December 2009 newsletter, at the bottom of a list of ZPRIM's investment returns, the newsletter said: "All numbers are GIPS compliant." But on the next page, under a section titled "GIPS COMPLIANCE," the newsletter said: "The investment report you are reading is not GIPS compliant. It was never intended to be nor can it be. . . . Our report remains not GIPS compliant." Petitioners say these statements "disavowed a claim of GIPS compliance," rendering the initial false claim immaterial. We agree.

18

There is no question the newsletter's initial statement—"[a]ll numbers are GIPS compliant"—was not true.  But our rule is that when a misrepresentation is "accompanied by meaningful cautionary statements and specific warnings . . ., that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law."  Saltzberg v. TM Sterling/Austin Assocs., Ltd., 45 F.3d 399, 400 (11th Cir. 1995) (per curiam); see also Merch. Capital, 483 F.3d at 767 (stating the "well-established principle that a statement or omission must be considered in context, [because] accompanying statements may render it immaterial as a matter of law" (quotation omitted)).  While "general cautionary language" is not sufficient to render a misrepresentation immaterial, see Morgan Keegan, 678 F.3d at 1253, the disclaimer in the December 2009 newsletter did not use generic or vague language.  It expressly and unequivocally said: "The investment report you are reading is not GIPS compliant."  This statement was then followed by two more that reiterated the point.  And these statements were all below a bold, underlined header titled "GIPS COMPLIANCE," which would have alerted reasonable investors that ZPRIM was calling attention to a GIPS compliance issue that investors should be aware of.  Like the cautionary statements in Saltzberg, ZPRIM's disclaimer was "no[t] boilerplate and was not buried among too many other things, but was explicit, repetitive and linked to the [statement] about which [the SEC] complain[s]."  See 45 F.3d at 400.  In light of the clear

19

cautionary statements in the December 2009 newsletter, we conclude that the Commission's finding of materiality for that newsletter is not supported by substantial evidence. We therefore reverse the Commission's finding that ZPRIM and Mr. Zavanelli violated sections 206(1), (2), and (4), and sections 206(1) and (2), respectively, based on the December 2009 newsletter.

## C.  SCIENTER FOR ZPRIM'S ADS AND NEWSLETTERS

### 1.  The Scienter Requirement

To prove a violation of section 206(1) of the Adviser's Act, the SEC must show the adviser acted with scienter. Steadman I, 603 F.2d at 1134. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48, 131 S. Ct. 1309, 1323 (2011) (quotation omitted). "Scienter may be established by a showing of knowing misconduct or severe recklessness." SEC v. Monterosso, 756 F.3d 1326, 1335 (11th Cir. 2014) (per curiam) (quotation omitted). Scienter can be established through direct or circumstantial evidence. Id. The scienter of a corporation is established by showing that the corporation's officers or directors acted with scienter. See Thompson v. RelationServe Media, Inc., 610 F.3d 628, 635 (11th Cir. 2010) ("Corporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them.").

2.  Scienter as to ZPRIM's Ads and Newsletters

The Commission found that Mr. Zavanelli (and thus ZPRIM) acted with scienter in publishing the false claims of GIPS compliance in ZPRIM's ads and newsletters.  Petitioners challenge this finding.  Because the facts underlying each set of publications differ, we discuss the issue of scienter separately for each, and conclude the scienter findings are supported by substantial evidence.

a.  Scienter as to the Fall 2008 Ads

Substantial evidence supported the Commission's finding that Mr. Zavanelli (and thus ZPRIM) acted with scienter in making misrepresentations of GIPS compliance in the fall 2008 ads.  In short, the evidence showed that Mr. Zavanelli knew the claims of GIPS compliance in the fall 2008 ads were false but approved them anyway.  See SEC v. Carriba Air, Inc., 681 F.2d 1318, 1324 (11th Cir. 1982) (holding that scienter is established when the defendant "engaged in the dissemination of a known falsehood" (quotation omitted)).

The record supports a finding that Mr. Zavanelli knew exactly what was required of an ad that claimed GIPS compliance.  He testified that he read the GIPS requirements, including its advertising guidelines, "[n]umerous times . . . forward and backwards."  He even described himself as "an expert" on GIPS.  Beyond that, Mr. Zavanelli clearly knew how to present GIPS-compliant investment returns in advertisements because he was responsible for "ensuring that

21

marketing materials [were] GIPS compliant." Indeed, from January to April 2008, ZPRIM published ads that contained the GIPS-required information.

Then in the fall of 2008, Mr. Zavanelli approved the new, non-compliant ads. Mr. Bauchle testified that before these ads were published, he told Mr. Zavanelli they didn't contain the return information required by GIPS. Yet Mr. Zavanelli ran the ads anyway. Indeed, he affirmatively directed Mr. Bauchle to leave the statement that ZPRIM is GIPS-compliant in the ad, even though he knew the investment returns in the ad did not comply with the GIPS advertising guidelines. In doing so, he "engaged in the dissemination of a known falsehood." Carriba Air, 681 F.2d at 1324 (quotation omitted).

There is also a strong inference of "intent to deceive" because the omitted GIPS-required returns resulted in covering up ZPRIM's poor investment performance. Matrixx, 563 U.S. at 48, 131 S. Ct. at 1323. There is certainly sufficient evidence to support the Commission's finding that the petitioners knowingly made false claims of GIPS compliance in the fall 2008 ads.

### b. Scienter as to the Spring 2011 Ads

Substantial evidence also supported the Commission's finding of scienter for ZPRIM's false claims of GIPS compliance in the ads published in spring 2011. After the 2008 ads were published, the SEC notified ZPRIM that its ads falsely claimed compliance with GIPS and might violate the Advisers Act. With this

22

letter, the SEC expressly put Mr. Zavanelli on notice that he needed to change the information on ZPRIM's ads to meet the GIPS advertising guidelines. In response, ZPRIM made clear it understood what was required of it. The firm told the SEC it would take "[c]orrective action[]" by "chang[ing] our ads" to include the investment returns required by GIPS. Yet despite ZPRIM's assurances, the firm published its 2011 ads without the GIPS-required information. Mr. Zavanelli concedes this omission made the claim of GIPS compliance "untrue," and also concedes he conceived of and approved the spring 2011 round of "untrue" ads. This establishes that he acted with scienter. See Carriba Air, 681 F.2d at 1324.

### c. Scienter as to the April 2009 Newsletter

It is similarly clear that Mr. Zavanelli acted with scienter in publishing the April 2009 newsletter.[7] Of course he had the same knowledge of the GIPS requirements in April 2009 as he had when he decided to publish the false claims of GIPS compliance in the fall 2008 ads. Beyond that, by this time ZPRIM had received an express warning from Ashland that if "[GIPS] compliance is being claimed" on ZPRIM's newsletters, "the GIPS Advertising Guidelines need to be followed." Despite this direct admonition from the firm's GIPS verifier, Mr. Zavanelli—who wrote "most of the newsletter"—failed to include the GIPS-required data in the April 2009 newsletter. This is sufficient to support the SEC's

___

[7] We do not address scienter for the December 2009 newsletter because, as discussed earlier, substantial evidence did not support a finding of materiality for that newsletter.

finding that the petitioners knowingly published the false claim of GIPS compliance in the April 2009 newsletter.  See id.

## D.  REQUIRED MENTAL STATE FOR THE MORNINGSTAR REPORTS

The Commission found ZPRIM liable for falsely stating in two Morningstar reports that it was not under SEC investigation.  ZPRIM (through Mr. Bauchle) made this false statement in the report for the period ending September 30, 2010, and, again, in the report for the period ending March 31, 2011.  The Commission found ZPRIM acted with negligence for the 2010 report and scienter for the 2011 report.  ZPRIM challenges both findings.  We conclude that both are supported by substantial evidence.

### 1.  Negligence as to the 2010 Morningstar Report

As set out above, violations of sections 206(2) and (4) can be established by a showing of negligence.  Negligence requires a showing that the investment adviser failed to exercise "reasonable care."  Capital Gains, 375 U.S. at 194, 84 S. Ct. at 284 (quotation omitted).  This record supports finding that Mr. Bauchle failed to act with reasonable care when he falsely reported to Morningstar in September 2010 that ZPRIM was not under SEC investigation.

Mr. Bauchle was responsible for submitting ZPRIM's information to the Morningstar database.  He acknowledged he knew the Morningstar reporting form asked whether the firm was under SEC investigation.  Thus, once the SEC sent

24

ZPRIM a letter in August 2010 notifying it that the SEC was "conducting an investigation" into ZPRIM, Mr. Bauchle had a duty to update the Morningstar database to show the pending investigation. See Finnerty v. Stiefel Labs., Inc., 756 F.3d 1310, 1317 (11th Cir. 2014) ("[A] duty exists to update prior statements if the statements were true when made, but misleading or deceptive if left unrevised."). Mr. Bauchle did not do this. As a result, the Morningstar report for the period ending September 2010 falsely showed investors that there were "No" "[p]ending SEC investigations" of ZPRIM. A person exercising a reasonable degree of care would have updated the form once the firm received express notice from the SEC of the pending investigation. Id. Thus, the record supports the finding that ZPRIM's misrepresentation in the 2010 Morningstar report was negligent.

2. Scienter as to the 2011 Morningstar Report

The record also supports the Commission's finding that ZPRIM (through Mr. Bauchle) acted with scienter in failing to disclose the investigation in the 2011 Morningstar report. In October 2010, Mr. Bauchle gave investigative testimony as part of the SEC's proceedings in this case, and counsel for the SEC specifically informed him that he was testifying in connection with the SEC investigation into ZPRIM. This shows Mr. Bauchle had direct, personal knowledge of the SEC investigation yet failed to disclose it in the 2011 report. He thus "engaged in the dissemination of a known falsehood." Carriba Air, 681 F.2d at 1324 (quotation

25

omitted).  Also, Mr. Bauchle testified that the reason he "didn't go back and change the [pending investigation] box" on the Morningstar form was "[b]ecause whenever we would get a new letter from the SEC, we would have a meeting and it was downplayed as [] being anything significant and so that box wasn't changed."  The fact that Mr. Bauchle made a deliberate decision not to disclose the SEC investigation because the firm "downplayed" its significance supports a finding of an "intent to deceive" investors.  Matrixx, 563 U.S. at 48, 131 S. Ct. at 1323.  Thus, there is substantial evidence to sustain the finding of scienter regarding the 2011 Morningstar report.

E.  SANCTIONS

The Commission imposed sanctions against both Mr. Zavanelli and ZPRIM.  First, the Commission imposed an industry bar against Mr. Zavanelli.  Second, the Commission ordered both petitioners to cease and desist their misconduct.  Third, the Commission imposed civil penalties.  Petitioners challenge each of these sanctions.  For the reasons that follow, we affirm the Commission's sanctions except those imposed for the violations related to the December 2009 newsletter.

1.  The Industry Bar Against Mr. Zavanelli

Under the Advisers Act, the Commission may impose an industry bar on an adviser if the Commission finds: (1) that the bar "is in the public interest," and (2) that the adviser "willfully violated" or "willfully aided, abetted, counseled,

commanded, induced, or procured the violation" of federal securities law. 15 U.S.C. §§ 80b-3(e)(5), (6) & (f). To determine whether a bar is in the public interest, the Commission considers the following:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

Steadman I, 603 F.2d at 1140 (quotation omitted). As for the willfulness prong, a violation is "willful" if the adviser "intentionally commit[ed] the act which constitutes the violation." Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quotation omitted). The adviser need not "also be aware that he is violating one of the Rules or Acts." Id. (quotation omitted).

The Commission did not commit a "gross abuse of discretion" in imposing the industry bar on Mr. Zavanelli. Orkin, 31 F.3d at 1066. In assessing the "public interest" prong, the Commission analyzed the Steadman factors and found that each factor showed the bar would be in the public interest. In particular, the Commission found Mr. Zavanelli "acted with a high degree of scienter" because "[d]espite his knowledge and familiarity with GIPS, [he] flouted the requirements of the GIPS Advertising Guidelines"; his "conduct was recurrent," continuing after "ZPRIM promised the previous year to take corrective action"; he "does not genuinely recognize the wrongfulness of his conduct"; and his "assurances against

27

future misconduct" were not convincing because he "continues to provide investment advisory services." The Commission then made the required finding of willfulness. The Commission found the "willfulness standard is satisfied because Zavanelli intentionally authored or approved the advertisements and investment reports containing the misrepresentations at issue." Each of these findings is supported by the record. Thus, the Commission did not grossly abuse its discretion when it imposed the industry bar. Id.

### 2. Cease and Desist Order

Under the Advisers Act, the Commission may issue a cease and desist order against any person it found to have violated the Act. See 15 U.S.C. § 80b-3(k)(1). Because the Commission found petitioners violated the antifraud provisions, the Commission was entitled to issue the cease and desist order against them. Id. The Commission also explained that a "cease-and-desist order will play a substantial remedial role with respect to ZPRIM considering that we have not revoked its registration as an investment adviser." In light of these findings, it was not a "gross abuse of discretion" to issue the order. Orkin, 31 F.3d at 1066.

### 3. Monetary Penalties

The standard for imposing monetary penalties is the same as for industry bars. See 15 U.S.C. § 80b-3(i)(1)(A). However, the factors for determining whether it would be "in the public interest," id., are different from the Steadman

28

factors.  The Advisers Act lists the following factors for making the public interest

determination:

>  (A) whether the act or omission for which such penalty is
> assessed involved fraud, deceit, manipulation, or deliberate or reckless
> disregard of a regulatory requirement;
>  (B) the harm to other persons resulting either directly or
> indirectly from such act or omission;
>  (C) the extent to which any person was unjustly enriched,
> taking into account any restitution made to persons injured by such
> behavior;
>  (D) whether such person previously has been found by the
> Commission, another appropriate regulatory agency, or a self-
> regulatory organization to have violated the Federal securities laws,
> State securities laws, or the rules of a self-regulatory organization . . .;
>  (E) the need to deter such person and other persons from
> committing such acts or omissions; and
>  (F) such other matters as justice may require.

Id. § 80b-3(i)(3).

The Act also establishes a three-tier system of civil penalties, with each tier

addressing increasingly serious misconduct and imposing progressively higher

maximum penalties.  Id. § 80b-3(i)(2).  If the Commission applies the public

interest factors listed in the Act and determines that some monetary penalty is

warranted, the Commission must then decide which tier is appropriate.  In this

case, the Commission imposed second-tier penalties, which apply when the

wrongdoing involves fraud or deceit.  Id. § 80b-3(i)(2)(B).  Specifically, the

Commission imposed a maximum second-tier penalty on Mr. Zavanelli for each of

his eight violations, totaling $570,000, and a single below-maximum second-tier penalty of $250,000 on ZPRIM.[8]

Petitioners have not shown these penalties were a "gross abuse of discretion." Orkin, 31 F.3d at 1066. In deciding whether to impose the monetary penalties, the Commission discussed each of the public interest factors. The Commission found, among other things, that the petitioners "repeatedly violated the antifraud provisions with scienter"; the misconduct was "especially serious because it involved attempts to promote their firm through false claims"; and "[t]here is a need to deter [petitioners] from committing future" violations. These findings are supported by the record, and the Commission appropriately gave them significant weight. Also, while acknowledging that the SEC did not offer evidence to quantify the harm caused by the petitioners' misrepresentations, the Commission found the market was harmed insofar as the misrepresentations "denied investors the ability to make direct comparisons between ZPRIM's performance and that of other investment advisers." On this record, we cannot say the Commission grossly abused its discretion in its choice of monetary penalties. See id.

Although we generally affirm the Commission's imposition of monetary penalties, the amount of the penalties imposed here must be reduced by any

---

[8] The maximum penalty for corporations is considerably higher than for "natural person[s]." 15 U.S.C. § 80b-3(i)(2)(B).

30

amounts related to the December 2009 newsletter violations, which we vacate. Because the Commission's order makes clear it assessed a $75,000 penalty on Mr. Zavanelli for the December 2009 newsletter, we vacate that portion of his monetary sanction.  For ZPRIM, however, the Commission did not impose penalties for each violation, but instead a single $250,000 penalty.  As a result, we vacate the ZPRIM penalty and remand for the Commission to determine the amount, if any, by which that penalty should be reduced.

## IV.  CONCLUSION

We affirm the Commission's finding that ZPRIM violated sections 206(1), (2), and (4) of the Advisers Act by making false or misleading claims (a) that it was GIPS compliant in the fall-2008 and spring-2011 magazine ads and in the April 2009 newsletter; and (b) that it was not under SEC investigation in the 2011 Morningstar report.  We also affirm the Commission's finding that ZPRIM violated sections 206(2) and (4) for the 2010 Morningstar report.  We vacate the Commission's finding that ZPRIM violated sections 206(1), (2), and (4) of the Advisers Act for the December 2009 newsletter.  In light of that holding, we also vacate the monetary penalty against ZPRIM and remand this case to the Commission for it to determine whether the penalty should be reduced in light of our decision, and if so by how much.

31

We affirm the Commission's finding that Mr. Zavanelli violated sections 206(1) and (2) of the Advisers Act by making false or misleading claims that ZPRIM was GIPS compliant in the fall-2008 and spring-2011 magazine ads and in the April 2009 newsletter.  We vacate the Commission's finding that Mr. Zavanelli violated sections 206(1) and (2) for the December 2009 newsletter.  We therefore also vacate the $75,000 penalty the Commission imposed on Mr. Zavanelli for the December 2009 newsletter.

**PETITION GRANTED AND REMANDED IN PART AND DENIED IN PART.**